(127 So. 527)

**VERNER et al. v. MOSELY.**

**6 Div. 230.**

Supreme Court of Alabama.

Dec. 19, 1929.

As Modified on Denial of Rehearing April 3, 1930.

Foster, Rice & Foster, of Tuscaloosa, and Rushton, Crenshaw & Rushton and Hill, Hill, Whiting, Thomas & Rives, all of Montgomery (J. L. Drennen and John S. Stone, both of Birmingham, on the brief), for appellants.

Steiner, Crum & Weil, of Montgomery, and H. A. & D. K. Jones, of Tuscaloosa, for appellee.

BROWN, J.

The decree from which this appeal is prosecuted compels rescission of the sale of certain valuable business property situated in the city of Tuscaloosa, Ala., and cancels the deed made by appellee to appellants on the 27th of January, 1919, requires the complainant, appellee here, to do equity by repaying the purchase price with interest, and requires the respondents, appellants, to account for the rents, incomes, and profits received by them from said property.

The appeal was prepared and submitted under Rule 46 of Supreme Court Practice, and it is deemed unnecessary to make an elaborate statement of the issues as presented by the pleadings.

The asserted grounds for relief stated in the bill, in the alternative, are that the sale and conveyance of the property was brought about by actual fraud or undue influence exercised by the respondent, Verner, who at the time and for many years had been acting as complainant's attorney and trustee in handling her property.

Complainant offers to do equity, and, to this end, submits herself to the jurisdiction of the court.

No question is raised as to the sufficiency of the very elaborate averments of the bill. presenting the case, in the alternative, in its different and sundry phases. It is conceded

by appellants in argument that the evidence offered by the complainant showing the confidential relations existing between complainant, Mrs. Mosely, and the respondent, Mr. Verner, in connection with evidence tending to show that the price paid for the property by the respondent was greatly less than its value, made a prima facie case for relief.

It is likewise conceded by appellants, and correctly so, that the infirmities arising from the existing confidential relations between Mrs. Mosely and the respondent, Verner, unless overcome by countervailing evidence, or the right to proceed has been lost through laches, is effective to authorize relief against both of the respondents. This is so because undue influence is regarded by courts of equity "as fraud of most serious character." Boardman v. Lorentzen, 155 Wis. 566, 145 N. W. 750, 52 L. R. A. (N. S.) 476; Shipman v. Furniss, 69 Ala. 555, 44 Am. Rep. 528; 12 R. C. L. 231, § 3; 6 R. C. L. 637, § 52. And the interest of all who participate in or benefit by a transaction superinduced by such fraud is affected thereby, and may be avoided by a court of equity. 24 R. C. L. 311, § 596.

The rules of administrative procedure in cases involving transactions inter vivos, where one party stands in relation of trust and confidence to the other, such as is here involved, attorney and client, trustee and cestui que trust, where the dominant party— and in this relation the attorney or trustee is regarded as the dominant party—receives or derives a benefit or advantage from a transaction during the existence of such relation, the party reposing the confidence, on seasonable application to a court of equity, may obtain relief from the burden of such transaction, by showing the transaction and the confidential relations, unless the person receiving the benefit overcomes the presumption of undue influence by evidence which reasonably satisfies the judicial mind that the transaction *was in every respect just, fair, and equitable.* McQueen v. Wilson et al., 131 Ala. 607, 31 So. 94; Gibbons et al. v. Gibbons, 205 Ala. 636, 88 So. 833; Kidd, Ex'x v. Williams, 132 Ala. 140, 31 So. 458, 56 L. R. A. 879; Dawson et al. v. Copeland et al., 173 Ala. 267, 55 So. 600; 6 R. C. L. 637, § 53.

To state the proposition in the language of the authority last above cited: "What constitutes undue influence is a question depending upon the circumstances of each particular case. It is a species of constructive fraud, which the courts will not undertake to define, by any fixed principle, lest the very definition itself should furnish a finger-board pointing out the path by which it may be evaded. Whenever the relations between the parties appear to be of such character as to render it certain that they do not deal on terms of equality, but that unfair advantage in a transaction is rendered probable, either because of superior knowledge of the matter derived from a fiduciary relation or from over-mastering influence on the one side, or from weakness, dependence or trust justifiably reposed on the other side, the presumption is that the transaction is void, and it is incumbent on the stronger party to show affirmatively that no deception was practiced or undue influence used, and that everything was fair, open, voluntary and well understood."

The salient facts, briefly stated, are: Complainant's father, whose name was Morgan, died when complainant was a mere child— some four or six years old—leaving to her a considerable estate consisting of real estate— business property—located in Tuscaloosa, including a part of the property, the subject of this controversy. Complainant's mother, who afterwards married James Nunnelee, was appointed guardian of said complainant's person and estate, and handled the matter of said estate commencing in the year 1889, with the aid, assistance, and advice of the respondent Verner, and until the complainant became of age. At this time Mrs. Nunnelee made a final settlement of her guardianship, and the evidence goes to show that in this settlement Verner acted as her attorney. Thereafter, Verner, as complainant's attorney and "trustee," so styled by himself in his dealings with the complainant and her property, took full control of the management of said estate, making repairs and improvements, keeping the property rented, collecting the rents, paying the taxes, and, after deducting commissions and charges for his services, accounted to the complainant for the balance.

During the course of his dealings with the property as complainant's trustee, Verner acquired in his own right a parcel of land fronting twenty feet on the south side of Broad street, and of equal depth with complainant's adjacent lot, which fronted sixty-two and one-half feet on said Broad street, and extending back to an alley which was from sixteen to twenty feet in width. Verner sold this lot to complainant, according to his testimony, for just what he paid for it.

Thereafter the respondent Verner negotiated a loan for complainant for $20,000, at 6 per cent. per annum, securing the repayment of the loan by mortgage on all of complainant's property, including her homestead. The money so obtained was used to construct a business house on the lot fronting eighty-two and one-half feet on South Broad street. This money was expended, and said building constructed under the management of Mr. Verner; Mrs. Mosely at that time not residing in Tuscaloosa.

The property thus improved, together with one-half of the alley immediately south of the building, upon which at the filing of the bill was located a permanent brick building, approximately nine feet in width and twenty

feet in length, is the subject-matter of this controversy.

The evidence shows that Verner's management of the property was of a sort that inspired in the complainant utmost confidence in his fidelity to her interest; and such was their relation at the time of the sale under consideration, and thereafter up until the spring of 1923.

To quote from complainant's testimony: "Mr. Charles B. Verner rented the buildings and had all the repairs made, paid all the bills that were incurred from such expenses; he paid the taxes, assessed them, and kept all the insurance papers, and kept them paid; made all the leases, kept all the papers, and he had a *power of attorney to sign my name* to notes, and he bought and sold real estate, and also had the power to make promissory notes for me, he borrowed money for me and signed my name to the notes; during the time the said Verner acted as attorney or trustee for me in the handling of my property, I personally exercised no supervision or control of the property, and had nothing to do with it, and the property was entirely in charge of Mr. Verner." (Italics supplied.)

And even after the transaction here involved, complainant gave expression to this confidence and trust in her letter of April 7, 1919, in answer to Verner's offer to reconvey his interest; "I trusted you to do the right thing, and I have always said that I wanted to think of you, and feel toward you, and see you in just the light that Mr. Mosely did. You know how he felt about you—what your friendship, your opinion, and advice meant to him. He loved you and looked upon you as being as near perfect as any human being on this earth could be"—and concluding with the statement: "I would not even think for one minute of accepting your offer to take your share of the property."

The evidence further shows that complainant was without business experience and had taken no part in the management of her property; that her husband was by profession a bookkeeper, and, after his health failed, they moved to Tuscaloosa and he engaged in truck farming up until his death on December 20, 1918, leaving the complainant surviving with two small children.

Complainant's mother died on July 14, 1918, and the evidence goes to show that, at the time of the sale, and for some months preceding, complainant was depressed with grief from the loss of her husband and mother, and she testified: From July, 1918, to January 1, 1919, "I was almost a physical wreck."

On the other hand, the evidence shows that the respondents are both men of superb business ability, one the president and the other active vice president of one of the leading banks of the city; were then well advised as to the values, present and prospective, of real property and its desirability as an investment.

Witnesses examined by complainant, all citizens of Tuscaloosa, nineteen in number, estimated the property to be worth from $42,500 to $100,000, on January 27, 1919; while those examined by the respondents, also citizens of Tuscaloosa, ten in number, estimated the reasonable value of the property at the time of the sale to be from $30,000 to $49,500.

While it is true, as argued by appellants, that this is opinion evidence given long after the transaction involved, still it is legal evidence (Code of 1923, § 7656) due to be considered along with the other evidence, and when so considered in connection with the fact that the deed conveyed title to one half of the alley, a fact that was probably not brought to the attention of the witnesses in making their estimations, and the fact that Verner sold his one-third interest to Fitts, within three years, for a price equal to four-sevenths of the entire price paid, the fact that the rentals for the property soon after the transaction were greatly increased, and other circumstances, we are at the conclusion that the price paid was not a fair and adequate price for the property, and was less than its real value.

It appears from the statement of the respondent Mr. Verner, in a letter dated March 25, 1916, to Mr. Nunnélee, who then lived in Montgomery, that the property in controversy was renting for $232.50 per month, $2,790 per annum; that it was then incumbered by a mortgage of $20,000, drawing interest at 6 per cent. per annum, and lien for sidewalk improvements of $6,000. That complainant was receiving from her other property an income of $287 per month.

In that letter Mr. Verner suggested that he had a proposition from Mr. Fitts to purchase the property for $35,000; that complainant's husband had declined to sanction the sale, but that he (Verner) believed "that under all of the conditions existing here now, this would be a good sale of the property." Concluding this letter as follows: "Please write to me at your earliest opportunity and let me know what you think about this, and if you think it wise, I will drop over some time and talk the whole situation over with you. *I would suggest that you say nothing about this to Mrs. Nunnelee or Mrs. Mosely, until we make some further decision about it.*" (Italics supplied.)

Soon thereafter, on April 11, 1916, Mr. Verner was made president of the Merchants' Bank of which Mr. Fitts was vice president.

It further appears, without dispute in the evidence, that, though the property in controversy, at the time of the sale, was still incumbered by the $20,000, drawing 6 per cent. interest, it was not then matured, and there was no pressing necessity for its immediate

payment; that the lien for sidewalk improvements was $5,685.70, and the annual rents accruing from the property, in round numbers, were approximately $3,000 per annum.

The evidence further shows that Mr. Nunnelee, who was a newspaper man, moved from Montgomery to Tuscaloosa, and became connected with the Tuscaloosa News; that he took some active interest in urging and bringing about a sale, though complainant affirmed that he was without authority to represent her; that she had never offered the property for sale or suggested that it be sold; that she relied on the respondent Verner to represent her and protect her interest, and this testimony is strongly corroborated by the statement of Mr. Verner in his letter to the complainant of date of April 7, 1919, in which he stated: "I want you to know and feel that I only wanted to protect you in making the trade. I think that I have done this. If I have not, or even if you think I have not, I want you to take back the interest that is in my name. I have only worked for your interest and still intend to continue to do so, and I do not want you to feel that I have ever had any other interest in view." And her (complainant's) reply thereto of the same date, in which she said: "I trusted you to do the right thing, and I have always said I wanted to think of you, and feel toward you, and see you just in the light that Mr. Mosely did. You know how he felt about you, what your friendship, your opinion and advice meant to him. He loved you and looked upon you as being as near perfect as any human being on this earth could be."

Mr. Verner drew or dictated the conveyance and contract of sale, conveying to Fitts two-thirds interest, and himself one-third interest, for a recited consideration of $35,000, not only the lot proper as theretofore described, but one-half of the alley, with the design, as subsequent developments show, of placing thereon a permanent structure such as would deny to complainant and her tenants in the property adjoining the alley on the south its free and unobstructed use.

The deed was executed by complainant in the office of the Merchants' Bank in the presence of Verner and Nunnelee, and probably Mr. Fitts, and Mrs. Mosely's acknowledgment was taken, and nothing was said in reference to the description in the deed carrying full title to one-half of the alley; yet, according to Mr. Verner, Mrs. Mosely read the deed, or it was read to her. She testifies that she did not read it, but she relied on Mr. Verner to protect her interest. Still, if it be conceded that it was read to her, or that she read it, it is manifest that a mere casual reading of the deed, without special attention being drawn to the fact, its full purport in respect to the conveyance of the alley was not fully appreciated.

Three years after Verner and Fitts acquired the property, Verner sold his one-third interest to Fitts for $20,000, and the evidence shows, at the time of the trial, the property was producing $8,330 rents per annum, or $695 per month.

The appellants' contention here is that the evidence shows, at most, a condition affording an opportunity to exercise undue influence, but that it clearly rebuts the presumption that such influence was exercised. This contention is based on the evidence going to show that at no time before the deed was to be executed did Mr. Verner communicate with Mrs. Mosely in respect to the sale. That the sale was the result of the efforts of Mr. Nunnelee who acted for and in behalf of Mrs. Mosely, and that she had his advice in respect thereto.

█ Under the circumstances stated, we think it clear that it was Mr. Verner's duty, not to remain silent and inactive, but to fully advise Mrs. Mosely as to the value of her property, present and prospective, disclosing to her knowledge he had acquired during his trusteeship, extending over a period of years. As observed in Dawson et al. v. Copeland et al., 173 Ala. 267, 271, 55 So. 600, 601; "It is true that the principles of our law require a strict scrutiny of transactions between attorney and client, and the attorney is required to give his client the benefit of all the information he possesses in regard to the value of property which he purchases from his client." See 24 R. C. L. 296, § 579.

. Not only that, it was his duty to ascertain whether or not Mrs. Mosely was relying upon the judgment of Mr. Nunnelee, as to the advisability of the sale, or whether she was looking to him (Verner) to protect her interest in the transaction.

The suggestion that complainant had the advice of Mr. Nunnelee is answered by the fact which clearly appears from the evidence of Mr. Verner himself. Nunnelee was harking back to the suggestion of Verner, made some three years before, that the property should be sold to Mr. Fitts.

Verner testified: "The said J. H. Nunnelee stated to me on the streets when I met him —there had been an offer of thirty-five thousand dollars made for the Mosely property, the property involved in this suit, and that he thought it should be sold and the debts paid. Mr. Nunnelee stated to me further that he still thought it ought to be sold, *and I told him I thought I could get an offer of thirty-five thousand dollars for this property.*" (Italics supplied.)

This evidence shows, not only that Nunnelee—though probably without being conscious of it—was acting upon the suggestion of Verner, and carrying out his ideas expressed in 1916, but, when considered in connection with the statement immediately following, it shows that Verner actually participated in bringing about the sale, assuming

to represent Mrs. Mosely. To use his words; "I asked Mr. Fitts would he give thirty-five thousand dollars for the Mosely property, and Mr. Fitts said he wasn't interested in it. He said if he could get it *cheap enough,* but he wouldn't pay thirty-five thousand dollars for it. I told Mr. Fitts in my conversation with him about the Mosely property, that this property ought not to be sold for anything less than thirty-five thousand dollars, and Mr. Nunnelee *said so too."* (Italics supplied.)

■ Therefore, assuming that Mr. Nunnelee advised Mrs. Mosely to sell, this is not the character of independent advice that the law requires to sever the relation of trust and confidence, once shown to exist, and remove the imputation of undue influence. Marsh v. Elba Bank & Trust Co., 205 Ala. 425, 88 So. 423; Spiva et al. v. Boyd, 206 Ala. 536, 90 So. 289, 290.

■ It was also the duty of Verner, under the circumstances, to fully advise Mrs. Mosely that the conveyance, which she was called upon to sign, carried, not only the property itself, but the fee simple title to one-half of of the alley. Marsh v. Elba Bank & Trust Co., supra.

Furthermore, these circumstances, and the principles of equity, clearly suggest that Mr. Verner should have informed Mrs. Mosely that she would be expected and required to pay, out of the purchase money which she was to receive, the amount due for sidewalk improvements, in discharge of the lien on the property, so as to make good her covenants of warranty embodied in the deed. Yet she was not so informed, and did not realize she had been compelled to pay this large sum, until some time after, when the check was found signed by her, which, the evidence shows, in part was written by Mr. Verner.

■ After painstaking consideration, we are not convinced that the court was in error in holding that the evidence did not justify the conclusion that Mrs. Mosely ratified the transaction after full knowledge of the facts, or that she was guilty of laches in the prosecution of her suit to disaffirm and set aside the sale.

The letter written by Mrs. Mosely in April, 1919, in response to Verner's offer to reconvey, clearly shows that she was then under the domination of his influence, and her evidence goes to show that she did not become fully advised as to the value of the property until the spring of 1923, and up until that time, the relation of confidence and trust continued to exist, Verner acting for her in respect to other property which was not included in the sale to Verner and Fitts. Spiva et al. v. Boyd, supra; Hamilton v. Watson, 215 Ala. 550, 112 So. 115; Voltz v. Voltz, 75 Ala. 555; Noble's Adm'r v. Moses Bros., 81 Ala. 530, 1 So. 217; Pom. Eq. Jur. (2d Ed.) § 986.

■ We are not of opinion that the fact of Mr. Nunnelee's death is sufficient, under the circumstances, to justify the application of the doctrine applicable to stale demands. If it be assumed that, if he had lived to testify, his testimony would have corroborated the testimony of Verner, that he (Verner) did not represent Mrs. Mosely in making the sale and took no part therein, this testimony would not have been of controlling importance in the face of the admission of Verner, made before the litigation was instituted, that he assumed to represent complainant and protect her interest and acted only for her benefit.

As to Nunnelee's effort to obtain a more attractive price than was offered by Verner and Fitts, this is shown by other testimony that is in no way disputed.

In Salvo v. Coursey (Ala. Sup.) 124 So. 874,[1] cited by appellants, the bill was filed sixteen years after the transaction involved occurred. In the meantime, Mallory, the vendee in the sale, had died; the painter who did the painting, the proper execution of which, vel non, was an important issue in the case, had died; and the books and vouchers of Mallory, or his estate, were lost or discarded. Salvo knew of Mallory's death, and did not present the claim; he knew of subsequent changes of ownership of the property, and made no demand for payment. The testimony showed that during the lifetime of Mallory there had been a controversy between him and Salvo in reference to whether the work which was to be done on the building involved, in order to render Mallory liable for the $300 claimed, had or had not been done in accordance with the terms of their contract, which was partly verbal. And in that case there was an absence of any relation of confidence and trust that would have in any way interfered with the party in proceeding to protect his rights.

The existence of the confidential relation between the complainant and Verner, which continued up until less than eleven months before the filing of the bill, is sufficient to prevent the assertion of the doctrine of laches as a defense to the relief prayed. Gayle v. Pennington, 185 Ala. 53, 64 So. 572; Fowler v. Alabama Iron & Steel Co., 164 Ala. 414, 51 So. 393.

■ To repeat, in cases such as this: "The burden rests on the party claiming under the deed, to prove satisfactorily that it is just, fair and equitable in every respect, and not on the party seeking to avoid it to establish that it is fraudulent." Spiva et al. v. Boyd, supra; Burke v. Taylor, 94 Ala. 530, 10 So. 129.

After full and painstaking consideration of the case by the court, sitting in banc, the

---

[1] 220 Ala. 300.

opinion prevails that the respondents failed to meet the burden of proof resting upon them, and that the decree of the trial court granting the relief should stand affirmed, and that the application for rehearing should ·be overruled.

Affirmed; application overruled.

ANDERSON, C. J., and SAYRE, GARDNER, THOMAS, and BOULDIN, JJ., concur.

FOSTER, J. (dissenting).

I cannot concur in the result reached by the majority of the court. The difference between us relates to the issue of whether appellants have met the burden which the law imposes upon them. It must appear either that appellee, in the transaction with appellants, did not rely upon Mr. Verner as her agent and attorney, but that she relied upon independent advice of another in whom she had confidence, or that, though she did rely upon him, the transaction was fully understood by her, that she freely and voluntarily approved it, and that no advantage was taken of her, but that the transaction from her standpoint was fair, just, and reasonable. Scott v. Hardyman, 218 Ala. 515, 119 So. 224; Kidd v. Williams, 132 Ala. 140, 31 So. 458, 56 L. R. A. 879.

Mr. Verner was admittedly her confidential agent, attorney, and trustee, in whom she had great confidence. While so, and during the life of her husband, and of her stepfather, who were also apparently on confidential terms with her, he suggested to them. some three years before the sale, that it could be effected on the terms which were finally agreed upon, and he thought it advisable. He very carefully submitted the matter to her husband and stepfather for their approval before suggesting it to her. They did not then seem to approve it, and apparently nothing further. occurred about a sale until after the death of her husband. and without further suggestion from Mr. Verner. The stepfather, Mr. Nunnelee, who was then living with appellee, apparently in a parental position to her. suggested to Mr. Verner that he thought it would be advisable. The sale resulted from this suggestion, after he had been advised by Verner to try and get a better price for the property, if he could. This he undertook to do and failed. He is now dead. There is no claim of collusion between him and Verner, nor other bad faith on his part. He acted for appellee in negotiating and closing the transaction whether by her authority or not. Mr. Verner had no apparent reason to suspect that appellee did not authorize, approve, or fully understand what he was doing in that respect for her. Mr. Nunnelee advised with other friends as to its desirability. Finally it was effected without any communication respecting it between appellee and Verner until the occasion of its closing. On that occasion Mr. Nunnelee was present with her. She seemed satisfied. I am not prepared to say that there was not sufficient independent advice to satisfy the law. I think that a fair inference from the evidence is that she did "perform an entirely free and unfettered judgment independent altogether of any sort of control" by Verner. I also think the evidence fairly shows its justice, fairness, and reasonable judgment from her standpoint. The. property was mortgaged heavily, which also covered ·her other property. She had no reasonable expectation of paying the mortgage without selling something. Her income did not justify the expectation of that ever paying it. It was a burden upon her, and she was dependent for her support upon the income from her property. There were other liens against it. The year 1919, as is commonly known, was a good year in which to sell. It is a matter of common knowledge that values were generally well maintained everywhere. No better season for selling (as conditions then appeared) could well be suggested. The need was apparent. There was no opportunity to sell other property. Good judgment, I think, suggested a sale of a sufficient amount to relieve her of the burden of the liens. Many wise investors unloaded their holdings during such times, as is well known. Could people then foresee a future industrial activity for Tuscaloosa which would enhance property values? The all-important question is whether the price was fair, just, and reasonable. The value of real estate is always a difficult and uncertain problem. Even so with present values in any period. In perhaps every instance, informed, competent, honest men differ in opinion as to them. They are but the result of opinions. There is no market which fixes such values in a definite way. Many factors are controlling. They are almost innumerable. Anything which sheds light upon the issue is material. Much depends upon business forecasts. What will the future be? No man can tell. What will future values be? No one can foresee. We are now looking backward, but they were looking into the future, and could not see what we now know. We cannot interpret conditions then by what has occurred later. The real issue is in the present, .but that is affected by business forecasts for the future. However difficult it is to fix present values of real estate, the difficulty and uncertainty are many times increased after later events have occurred, and the effort is now to go back and say what they were several years ago, when the factors which control them have materially changed, and the future of that period has become a reality. Is one's memory accurate as of that date. Did he endeavor at the time to judge and fix in his mind and memory a value which he now clearly recalls?

The evidence was in much conflict as to the value of the property at the time of the transaction in 1919. An effort was made to sell it

otherwise. They tried to get what they could from others, and received no bids. Dealers in such property were not enthusiastic. The reasonable inference from the evidence is that no one else would give more for the property. Some months afterwards, when some criticism had been expressed on the street, Mr. Verner, in a written communication to appellee, offered to rescind to the extent of his interest—all that he could do. She declined, not because there was no offer to rescind as to all interests, but stated that she was fully satisfied with the whole transaction. She apparently remained satisfied for several years. She waited until after the death of Mr. Nunnelee, and after values had increased, and Verner had sold his interest (she previously declining to take it), and until friction arose as to the use of the alley. Then comes the suit. After all the years of honest, intelligent, capable service, he (Verner) is now discredited and held up to the world as having violated a sacred trust. Such is the irony of fate.

I do not think controlling importance should be given to an inference that she may not have fully understood that she was conveying half of the alley. There was no deception, and she must have fully understood it very soon afterwards, because a building was then put upon it. Yet she made no complaint.

I think that the evidence shows no unfair dealing, but that, under the circumstances and conditions which people could then see, the transaction was apparently fair and just to appellee, and that she should not now, because of its enhancement in value, obtain the benefit of such enhancement by reflecting upon the integrity of a faithful servant.

I cannot concur therefore in the result reached by the majority of the court.