## No. 15,448.

### DITTBRENNER *v.* MYERSON, ET AL.
(167 P. [2d] 15 )

Decided January 28, 1946. Rehearing denied March 4, 1946.

450

Mr. A. X. ERICKSON, Mr. DON B. OLIVER, for plaintiff in error.

Mr. ALBERT J. GOULD, for defendants in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

 Ellen Dittbrenner brought action below against Louie Myerson and others, charging fraud in connection with the sale of real estate. The trial court denied relief and plaintiff urges reversal upon the ground that the court misconstrued the issues of fact and law and that the evidence conclusively discloses actionable fraud. In this situation it becomes necessary that we examine the evidence and ascertain if the trial court properly conceived the law of the case and, if not, whether its decree is supported by the evidence under a proper conception of the law. *Davis v. Pursel,* 55 Colo. 287, 134 Pac. 107.

There is no evidence that any defendant, other than Louie Myerson, participated in the transaction here involved or acquired any advantage therefrom, and as to them judgment of dismissal was properly entered. For convenience we shall refer to defendant Louie Myerson as the defendant or by name.

Judgment below having been favorable to defendant, all disputed questions of fact must be here likewise resolved. The evidence, so considered, was in substance as follows:

Defendant at the time of the conveyance of real estate here involved was, and for about twenty years had been, engaged in the business of personally buying, selling, and trading in real estate, making real estate loans, and appraising buildings and properties, and there was no question as to his intimate and expert knowledge of property values. He maintained an office in downtown Denver and operated generally under the name of Fidelity Investment Company, but voluntarily admitted that he owned the company entirely except for two qualifying shares and handled all its finances through his personal bank account, and that the corporation was merely a "dummy."

Plaintiff was a forty-five year old housewife, whose education included only one year in high school and a start at a business course which she could not finish. Her business experience appears to have been limited to a one-time clerkship in an insurance office and the management of her apartment house in Denver after her husband's death. This property had been purchased by her husband before their marriage and became hers by inheritance from him.

On January 20, 1941, plaintiff went to defendant's office and made application for a loan. She was accompanied by William C. Bergren, who was then connected with some mining operations at Alma, Colorado, and with whom defendant had been acquainted for several years. Bergren was joined as a party defendant herein but was not found and served with process. Between January 20 and March 25, a period of nine weeks, plaintiff procured four loans from defendant which were consolidated and represented by her final note for $5,000 due in three years and secured by first mortgage on the apartment house. She had received

a total of $4,400 on these loans and the remaining $600 had been retained by defendant as his fees and expenses. He had no fixed or percentage basis of charge for such loan. Defendant's brother appraised the apartment house in connection with the first loan and before the last loan ·defendant personally looked at the property and appraised it.

·On her first visit, plaintiff told defendant she was ·buying property at Alma, and on her second request for money she wrote from Alma, "In order to protect my investment in the mine I find I will need $1,000 more, on my loan from you." In procuring every loan she was accompanied by Bergren. It is apparent that both defendant and his attorney were impressed· by plaintiff's lack of judgment in connection with these loans she was making for mining ventures. Defendant testified that he hold her, "this money was easy to borrow and awfully hard to pay back," and that "she told me it was my business to make the loans and her business to do whatever she pleased to do with the money." Defendant's secretary testified that when so warned by defendant plaintiff said that "what she did with that money was her own business and if Mr. Myerson didn't want to make the loan she could get it elsewhere." Defendant's attorney, who attended to the examination of title and making the papers in the transactions, testified that when one of the loans was made, "I came in the door with the papers and asked her whether she knew what she was doing. She said she was borrowing money. And Mr. Myerson at that time said to her, he says, 'you know, it is easy to get but hard to repay?' And she made the remark then, 'Well, where I am putting it I won't have any trouble repaying it'." Mrs. Dittbrenner's business incompetence is apparent from her testimony and correspondence appearing in the record, as well as from her conduct of the transaction involved in this proceeding.

On April 8th, just two weeks after the fourth loan,

defendant read in the newspaper of that date an article with the heading, "Two Men Held in Alleged Plot to Bomb Hotel," relating that plaintiff's then husband, one Nedorost, and a companion had lain in wait for plaintiff's son-in-law and that Nedorost told him that unless plaintiff paid him $2,600, he would blow up the apartment house on which defendant had a mortgage; that both Nedorost and his companion had been arrested, and stolen dynamite fuses were found in the latter's possession; that Nedorost had previously been arrested several times on drunkenness charges and that while drinking he had fired a shot at plaintiff and her daughter. Defendant testified: "I happened to go down to the cigar stand down in our building, and I happened to be glancing through the paper and noticed it. When I came up to the office there was a call for me to call Mrs. Dittbrenner. I called her up and she told me she wanted to borrow every dollar she could on the Stony Court Apartments." When asked for a further loan, defendant testified, "I told her from what I had seen in the paper I wouldn't be interested in making any more loans on the property," and that she then said that she was going to sell the property, that she would have to sell the property if she couldn't get a loan on it. She wanted to know if he would not make her an offer on the property and he asked her what she wanted. She offered to sell it to him for $13,000. He declared he would not be interested at all at that price. The next morning she came to defendant's office, again with Bergren, and said she was going to sell the property for whatever she could get. After further discussion as to price, defendant offered $10,000, providing she "would make all adjustments." She tried to get him to give her $10,000 in addition to "the adjustments," which he refused, and he finally procured conveyance of the property from her the day following by giving her two checks, (one of them postdated), for $2,000 each and a deed to a half section of land in Park county, Colorado.

This land was not deeded to plaintiff by defendant, but defendant had in his possession a deed purporting to convey the property from one Mercer to one Worneck and procured a deed from Worneck to plaintiff claiming that he, the defendant, was the actual owner and merely kept the title in Worneck's name. Defendant himself executed a deed purporting to convey to plaintiff a one-half interest in the oil, gas and mineral rights in this land which he said had been conveyed to him, and for some undisclosed reason attached a $5.00 revenue stamp to his deed. He told plaintiff that he had $650 in this property and that it was grazing land, but testified at the trial that he originally had a mortgage of $500 on it, which was part of a commission loan, so he had not appraised it or looked at it; that the mortgage became delinquent and he took a deed to the oil rights for the $30.00 then delinquent interest; that he told her she could have half or all of the oil rights and she chose only half. It appears from the evidence that this land was at an altitude of around 10,000 feet, with gravelly surface; that it was very poor pasture and the improvements consisted of a log building that had fallen down, a barn with the roof fallen in, and a well perhaps 50 feet deep without indication of water in it. Defendant further testified that he had talked to plaintiff about the Park county land in March, when they made the fourth loan to her, and that she then obtained the description of the land from him. It does not appear why he was interesting her in this land if she was considered merely as a borrower at that time.

Defendant procured conveyance of the apartment house property from plaintiff subject to the $5,000 mortgage which he held. He did not, however, take title to himself, but had conveyance made to one Louise Byers who, he testified, was his niece and who had no interest in the transaction whatever. It also appears from the record that at the time of the trial defendant did not know whether this niece was married or single

or where she lived, and that he had not seen her since a couple of months after the transaction.

In addition to the usual execution of deeds to carry out the conveyance of the properties, defendant required plaintiff to sign an instrument reciting the receipt from Louise Byers of $4,000 cash as balance of purchase price for the apartment house property, and enumerating the personal property to go with it. This instrument included inter alia the following provisions. "This conveyance is made by me to the said Louise Byers because of my desire to sell said property, and because of conditions which are better known to me and which I do not desire at this time to disclose to anyone. I am fully aware of the property for which the above deed is given to me this day, which property is located in the County of Park, State of Colorado * * * . The location of the said property is well known to me and no representations have been made by anyone concerning the value, location, useability or any other matter regarding the aforesaid property in Park County. I take the same as is and on my own personal investigation and recommendations of people you [sic] are associated with me and without any reliance upon any representations made by any person." The record discloses that defendant knew that plaintiff was not in any way acquainted with the Park county land. Its approximate location was pointed out to her on a map in his office. Defendant's attorney testified that plaintiff said, "she had an idea where it was because it was on the way to the mine," and that Mr. Bergren knew where it was and she would take her chances on it. It appears, however, that it was not in fact "on the way to the mine."

Upon being questioned as to the reason for requiring the provisions in the receipt above quoted, defendant's attorney, who had represented him for several years in real state transactions, testified that when there was a large amount involved such as there was in this case and it was an exchange of property such as here, he had

made it a practice to be sure there wouldn't be any question raised about representations; that he so advised defendant in this case and that there was nothing in this case to raise any question more than in the half a dozen or dozen other cases in which he had drawn similar contracts for defendant. Defendant himself testified that he always required such statements in connection with conveyances of property.

Under the terms of the agreement plaintiff was to retain the rents and possession of the apartments until the first day of May, a period of approximately three weeks. Prior to that date defendant listed the property for sale, as he testified, "at eighteen, nineteen or twenty thousand," through another real estate broker and sold it for $19,000 on the very day he received possession, receiving $6,000 in cash, the balance to be discharged in monthly payments, with interest at five per cent.

Plaintiff did not record the deeds purporting to convey to her the Park county land; their return was tendered in the complaint; at the trial they were tendered and put in evidence and are now in the files of the case, unrecorded.

On the testimony as above summarized, the court said that the only issue to be determined was "whether false representations were made to the plaintiff by Mr. Myerson, and if so, whether they were relied upon by her to her damage;" that fraud is never presumed; that it must be proved by clear and convincing evidence; that there was no agency or employment and that, as a consequence, defendant was under no fiduciary obligation to obtain the best possible price for the property; that the sale of the property was made upon the advice and suggestion and for the benefit of Bergren; that there was no significance to the value of the land in the mountains, whether it was valuable or not, or whether it was represented or misrepresented; that it was plaintiff's intention to, and she actually did, convey the property to Bergren; that she was indifferent to the value

of it; that she intended to give it to him and did give it to him; and that 'it didn't make any difference whether it was worth $5,000 or five cents, she didn't expect to receive any advantage from it. So believing, the court found that the charge of fraud had failed and gave judgment for defendant.

It is true that, prior to her conveyance to defendant, plaintiff had executed a deed to the apartment house to Bergren, and a deed to the cottage adjoining to her daughter, very evidently to keep any share from going to her husband, Nedorost—from whom she was separated—in case of her death. As she expressed it, "I might be picked up on the street." There is no suggestion that she intended to give it to Bergren. On the other hand, she did all the negotiating in connection with its conveyance to defendant. There is no suggestion of participation by Bergren. There is no evidence that she gave the proceeds of the property to Bergren, other than his endorsement of one of the two $2,000 checks, and all the evidence of her relations with Bergren is to the effect that she was not intentionally giving him either property or money, but was advancing money to him for supposed investment in her behalf. Neither is there any suggestion that she was indifferent to the value of the property. She was desperately trying to raise money on it and, on learning of the plot to bomb the apartment, she was frightened into a desperate re-solve to sell it immediately at whatever price she could obtain. By strange coincidence, the terrifying report of the threat to bomb the apartment was not published until six days after its discovery and the arrest of the parties, when plaintiff had come down from Alma and was back in Denver, and when she was convinced she must have more money for Bergren; and then defendant happened to go down to the cigar stand, that afternoon and happened to glance at the newspaper and happened to see the article about the threats on page 25 and plaintiff happened at that very hour to call him

for more money and be told of the threats. Her lack of business judgment was apparent to defendant and to his attorney. Her fright and desperate feeling that she must immediately dispose of the property was fully known to defendant. The very fact that defendant required plaintiff to sign the receipt, containing representations for his protection which he knew to be untrue, is evidence of fraudulent intent.

 In such a situation the facts are amply sufficient to bring the case under the third class of fraud set out by Lord Hardwicke in the classic case of *Earl of Chesterfield v. Janssen*, 2 Ves. Sr. 125, 155: Fraud " * * * which may be presumed from the circumstances and condition of the parties contracting: * * * to prevent taking surreptitious advantage of the weakness or necessity of another * * * ." The essential condition precedent to the applicability of this doctrine is an "inequality" between the parties; there must be weakness on the one side and advantage taken of that weakness on the other, and "It must appear that the dominant party either brought about the unevenness in the conditions, or, finding it ready to his hand, utilized and traded on it to extract from the servient party a gift or contract which he would not otherwise have made." Bower on Actionable Non-Disclosure, p. 390, §428. Where such a relation subsists between two persons, "The law presumes in favour of the servient party, against the dominant party, (1) that the relation placed the dominant party in a position to exercise influence and dominion over the servient party; (2) that such influence and dominion operated upon, and procured, the transaction; and (3), that the influence was an improper and unfair, or (to use the accepted phrase) an 'undue influence'." Bower on Actionable Non-Disclosure, p. 363, §405. " * * * when the relative position of the parties is such as prima facie to raise this presumption, the transaction cannot stand unless the person claiming the benefit of it is able to repel the

presumption by contrary evidence, proving it to have been in point of fact fair, just, and reasonable." *Aylesford v. Morris,* 8 Ch. App. 484, quoted in Bower on Actionable Non-Disclosure, p. 391, §428.

■ "The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation is shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed." *Sears v. Hicklin,* 13 Colo. 143, 148, 21 Pac. 1022, quoting from Kerr, Fraud & Mistake 183.

Accordingly, the court here erred in determining as a matter of law that the only issue was that of false representations; that defendant was under no obligation as to the price at which he could procure the property and that there was no significance as to the value of the mountain land or misrepresentation concerning its value. Under the circumstances of the parties here, as established without contradiction, actual misrepresentations were not necessary in order to establish constructive fraud. While fraud is never presumed in limine, undue influence may be presumed from such circumstances, and the value both of the apartment house and Park county land is a material and vital element in the determination of whether or not the transaction here under consideration was improper and unfair to plaintiff.

■ The question of value of the properties, as compared with the price paid, becomes material and important for still another reason: An inadequate consideration may bring the case within Lord Hardwicke's second class of fraud, to wit: That which "may be apparent from the intrinsic nature and subject of the bargain itself, such as no man in his senses and not under delusion would make on the one hand, and as no

honest and fair man would accept on the other, which are inequitable and unconscientious bargains." It is, in itself, a fact from which fraud may be inferred. 3 Pomeroy's Eq. Jur. (5th ed.), p. 627, §§923, et seq. Mere inadequacy in price is not a sufficient ground for relief if the parties, being in the situation and having the ability to do so, have exercised their own independent judgment; the inadequacy must either be accompanied by other inequitable incidents, or in itself must be so inequitable as to indicate fraud. Fraud is a fact which may be inferred, like other conclusions of fact, from the evidence and inadequacy of consideration is evidence from which fraud may be inferred. Such evidence may be weak or strong, according to its amount and other circumstances. Relief is granted, not on the ground of inadequacy of consideration, but on the ground of fraud as evidenced thereby. Gross inadequacy of consideration will call for explanation and shift the burden of proof upon the party seeking to enforce the contract, and will require him to show affirmatively that the price was the result of a deliberate and intentional action of the parties. Pomeroy, op. cit. supra, p. 637. Under the Roman law, if the price paid for lands was less than one-half of their value, the seller could compel relief, and like method is found in the French law. 3 Pomeroy's Eq. Jur. (5th ed.), p. 637, note 18. No such arbitrary rule exists under our law. But, "If the price was less than one-half of the value of the subject matter, and there were no circumstances showing an intention on the part of the vendor to confer a bounty or favor, the sale would doubtless be set aside." Id. p. 638, note 18. Where the inadequacy of consideration does not stand alone but is accompanied by other inequitable circumstances, the relief is much more readily granted, and "whenever a person is in pecuniary necessity and distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is

unfair, made upon an inadequate consideration, and the like, even though there be no actual duress or threats, equity may relieve defensively or affirmatively." 3 Pomeroy's Eq. Jur. (5th ed.), p. 763, §948. "And where there are other ingredients in the case of a suspicious nature or peculiar relations between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud." 1 Story's Eq. Jur. (14th ed.), p. 339, §355.

As to the value of the property, the recited consideration paid by plaintiff's husband appearing in the abstract of title entry was inadmissible, first because the abstract of title was incompetent as evidence of the price actually paid, and, second, because it was too remote; the mere price paid for an apartment house in 1934 could have no legitimate bearing upon its value in 1941. Defendant's testimony, that he "figured the property was worth $10,000," is not to be considered, because he testified that he based his appraisal on seeing that plaintiff had paid less than $10,000 for the property, which was not true, and it is refuted by the fact that he straightway offered it for sale, not at that price but at virtually twice that amount, and sold it on the very day he took possession for $19,000, which was more than his listing price. The fact that in a petition filed in June 1939 by plaintiff as executrix of her husband's estate for sale of certain other property this property was recited as having value of $13,110.00, being the same amount at which it was appraised for inheritance taxes in 1938, would have very slight, if any, materiality by itself on the question of its value in the summer of 1941. The appraisal was not evidence. It is analogous to assessment by the county assessor. *Denver & R. G. Co. v. Beckman,* 45 Colo. 470, 101 Pac. 976; *Fort Collins Dev. Ry. Co. v. France,* 41 Colo. 512, 92 Pac. 953; *Bankers Trust Co. v. International Trust Co.,* 108 Colo. 15, 113 P. (2d) 656. The petition reciting the same value as in the appraisal would be admissible, if at all, only

in the nature of an admission. It was too remote to have any probative value as such, in the absence of showing as to improvements or changes in this property and in values generally in that vicinity. The tendered testimony of the expert—who was unable to gain entrance to the apartments—based upon its rental value and other examination he was able to make was admissible—objection properly going to its weight and not to its admissibility. However, this was rejected by the court and no error in that ruling is here urged. As a result, the only proper evidence of value in the record is the valuation admittedly made by defendant in offering it for sale, to wit, from $18,000 to $20,000; the value at which it was immediately sold, to wit, $19,000, and the value as indicated by the rental of approximately $515 per month. None of the testimony as to the Park county land is even suggestive of substantial worth or any market value. From all this evidence it is apparent that the defendant obtained the property at not more than one-half its actual value.

The inequality of the parties, plaintiff's fear, both as to her person and as to destruction of the property, of which defendant had knowledge, the untrue statements regarding the transaction which defendant required plaintiff to sign, the use of "dummies" by defendant in the conveyances, the hurried closing of the transaction and resale of the property, and the gross inadequacy of the consideration paid, all considered together, as established by defendant's own evidence, constitute such a showing of overreaching and constructive fraud as to require a finding thereof by the court below on proper consideration of the applicable law. The property conveyed by plaintiff to defendant's nominee having been sold to an innocent purchaser, plaintiff is entitled to damages in the amount of the difference between the value of the property at the time of her conveyance thereof and the amount she received therefor. Since the Park county land may be reconveyed to

defendant and tender of such reconveyance was made in the complaint, such conveyance should be made and any question of its inconsiderable value eliminated. Defendant was not prevented by any ruling of the court from introducing any evidence he might have as to the value of the land he obtained from plaintiff. While plaintiff was prevented from making further attempted proof, her counsel has urged no assignment here based on that ground. Accordingly, neither party has the right to reopen the case and offer further testimony as to value.

The judgment is reversed and the cause is therefore remanded to the trial court for determination upon the evidence submitted of the value of the apartment house property conveyed by plaintiff at the time of such conveyance; for entry of judgment in favor of plaintiff and against defendant for the amount of such value in excess of the sum of $9,000, and for the redelivery to defendant of the deeds now in the files of this case purporting to convey to plaintiff the Park county lands.

Mr Justice Alter did not participate.

*On Petition for Rehearing.*

Mr. Justice Stone.

It appearing that the deed conveying to plaintiff a half interest in the oil and mineral rights in the Park County land has been recorded, plaintiff is hereby required to make proper reconveyance thereof, and in case of default therein the value of such interest, as may be determined by the court, shall be deducted from the amount of plaintiff's judgment.

The petition for rehearing is denied.