## No. 16,188.

HILLIARD, ADMINISTRATOR v. SHELLABARGER ET AL.

(210 P. [2d] 441)

Decided September 13, 1949. Rehearing denied October 10, 1949.

Mr. L. E. F. TALKINGTON, Mr. STUART B. ST. GERMAIN, for plaintiff in error.

Messrs. SILVERSTEIN & SILVERSTEIN, for defendants in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

The parties to this litigation are before us in the same order as they appeared in the trial court and will be hereinafter designated as plaintiff and defendants.

Plaintiff, as conservator of the estate of Agnes Rumery, brought this action to set aside a deed conveying real estate belonging to Rumery to the defendants. Generally, plaintiff alleged that the grantees in said deed paid a grossly inadequate consideration for said conveyance; that the grantor lacked the mental capacity to execute the deed; and that the same was secured from her by the exercise of undue influence by the grantees named therein.

All the material allegations of the complaint, except that concerning the transfer of the property, were denied by defendants in their answer.

The deed in question was dated the first day of April, 1947. May 13, 1947, Agnes Rumery was adjudicated a mental incompetent in the County Court of Denver, and May 15, 1947, this action was instituted. During the pendency of the action in the trial court Agnes Rumery died, and thereupon the plaintiff was appointed administrator of her estate. The trial was to the court without a jury. June 1, 1948, the trial court entered findings and judgment, the pertinent portion thereof being as follows: "The burden of proof is on the plaintiff, and, after most mature consideration of all the facts, I must conclude that the plaintiff has not sustained the burden, and the issues in this case will be resolved in favor of the defendants and against the plaintiff, and the plaintiff's complaint will be dismissed."

At the time of the execution of the deed here in question, Agnes Rumery was ninety-two years of age; she was very hard of hearing and had poor eyesight; her husband, ninety years of age, had died March 30, 1947,

and had not yet been buried. The defendants were, and for a long time had been, tenants of Mr. and Mrs. Rumery, occupying a portion of the property conveyed by the deed here questioned. Three qualified alienists testified that Agnes Rumery was wholly without mental capacity at that time; nonexpert witnesses related their experiences with her and expressed opposite opinions as to whether or not she was mentally competent at the time the deed was signed.

The consideration paid by defendants for the conveyance of the property by Mrs. Rumery was $6,000.00. Plaintiff contends that this sum was grossly inadequate and that the circumstances surrounding the execution and delivery of the deed, the weakness of mind of Mrs. Rumery, her extreme age and general inability to look after her own interests, combined with inadequacy of price, as a matter of law establish equitable grounds for setting aside the deed. Plaintiff further contends that there was a fiduciary or confidential relationship existing between Mrs. Rumery and the grantees named in the deed at the time of the execution thereof; that under the circumstances of this case there was a presumption of law that the deed was obtained by the exercise of undue influence; and that the burden of proof was shifted to defendants to establish that the transaction was in fact fair, just, and reasonable. Experts called by the plaintiff testified concerning the reasonable market value of the premises described in the deed, the lowest valuation fixed by plaintiff's witnesses being $15,000.00, and the highest $18,000.00. A duly qualified expert testified on behalf of defendants that a reasonable value for said property was $9,850.00.

The real estate in question consists of two city lots upon which is a dual residence building, each unit containing four bedrooms and bath on the second floor, and four rooms on the ground floor. By separate written instrument defendants agreed to permit the use and oc-

cupation by Mrs. Rumery of one side of the property, rent free, as long as she lived.

The evidence tending to establish the existence of a fiduciary relationship is substantially as follows:

Mr. E. P. Gallup, a real-estate dealer, testified that he had known Mr. and Mrs. Rumery since 1911; that at the time of Mr. Rumery's death on the 30th of March, 1947, he called upon Mrs. Rumery to extend his sympathy and help; and that while he was present Kathleen Shellabarger, one of the defendants, came in and stated that: "She had already requested a waiver—an inheritance tax waiver. I asked about funds, whether she had funds on hand, and she said—Miss Shellabarger said that she had made arrangements with the bank for that, in connection with her bank account. And I said, 'Well, who is going to take care of her? She needs somebody with her.' Miss Shellabarger said, 'Well, whom could you get?' And I said, 'Well, there are plenty of GIs and people who are looking for places to live who would be glad to come in and take care of her.' There was no reply to that, but Miss Shellabarger then went out with Mrs. Rumery, and I asked her to see about arrangements at the mortuary, and Miss Shellabarger said that they were going to take her over there after lunch to attend to that; and they disappeared together and went over to the Shellabarger house. Q. Miss Shellabarger returned after that, did she, Mr. Gallup? A. She what? Q. Did she return back, as you recall, after she took Mrs. Rumery out of the house or out of the room? A. Yes; she returned and said that they would look after everything. Q. Mr. Gallup, did you speak to Miss Shellabarger at that time about the physical and mental condition of Mrs. Rumery? A. Yes. Q. What did you say and what did she say? A. I told her that I thought she needed legal assistance to look after her interests. Q. And what did Miss Shellabarger say to that? A. She said that she—that her mentality was all right, in her opinion. That is about all. Q. What was Mrs. Rumery's

physical condition at that time? Was she very deaf? A. She was very deaf. It was hard for her to see. Q. Almost blind? A. Yes."

Mr. A. P. Estes, long-time acquaintance of decedent and caretaker of the property, testified concerning the visit of Mr. Gallup as follows: "Q. All right. Did you hear any conversation between Mrs. or Miss Shellabarger and Mr. Gallup? A. Yes, sir. Q. Tell the Court what conversation you heard, if any? A. Well, Mr. Gallup told Mrs. Shellabarger what he thought, she should have somebody to take care of her, there should be somebody in their place to take care of Mrs. Rumery because she wasn't able to take care of herself, and I believe Mrs. Shellabarger told him that she had made arrangements—something about the money, that they could get the money, and so on, to get what they needed, and she was attending to her business. Q. Mrs. Shellabarger said she was attending to Mrs. Rumery's business; is that it? A. That is the way I understood it."

The notary public, who took Mrs. Rumery's acknowledgment to the deed, was called by defendants and testified that for a number of years he and Kathleen Shellabarger were employed by the same law firm in Denver, and that at the request of Miss Shellabarger he went with her to decedent's home to take the acknowledgment of the signature of Agnes Rumery upon the deed in question. He also testified in part as follows: "Q. Who had the deed? A. Kathleen had it. Q. And she had the deed when you got to the house? A. Yes. Q. And she procured your assistance to acknowledge the deed? A. She asked me to go up there and acknowledge the deed. Q. And during all the time you were there, either Kathleen or her mother, or both of them were there? A. That is right. Q. You were never there alone with her? A. I was not." The deed was a printed form with the blank spaces filled in with a typewriter except for the date of the instrument, which, both as to day and month, was written in with pen and ink.

Thomas F. Vardie, assistant cashier of the Colorado National Bank, called by defendants, testified in part as follows: "Q. Were you acquainted with Mrs. Agnes Rumery during her lifetime? A. Only when she was brought there to the bank and opened her account. Q. What date was that? A. Well, on these papers that I was ordered to bring, it indicates it was April 14, 1947. * * * Q. Did she come in alone? A. No, sir. Q. Who was with her? A. Miss Shellabarger. * * * Q. She came in with Miss Shellabarger and Miss Shellabarger said she wanted to open an account; is that right? A. That is right."

A member of the law firm employing Miss Shellabarger testified that on April 19 (over two weeks after the execution of the deed in question) he called upon Agnes Rumery in connection with the administration of the estate of her deceased husband. In the course of his testimony we find the following: "Q. What took place? A. Well, when I reached her home Miss Kathleen Shellabarger was there. She opened the door and let me in, and introduced me to Mrs. Rumery. Mrs. Rumery was sitting there in her living room, and I told her that I understood that she wanted to see me about her husband's estate. She said Yes, she wanted to see a lawyer about it. She asked me if I was a lawyer, and I told her yes. And if I was the one that Miss Shellabarger had suggested to her. I told her yes. * * *"

Under this state of the record there is but one question which we are called upon to determine. That question is:

*At the time the deed was signed was there a fiduciary relationship existing between the aged and infirm grantor and the grantees which raised a presumption of undue influence in the procurement of the deed, requiring defendants to assume the burden of proving the transaction to have been in fact fair, just, and reasonable?*

This question must be answered in the affirmative.

The evidence conclusively shows that the defendants assumed to act in the interest of Mrs. Rumery upon the death of her husband. Even though the trial court found that decedent was mentally competent to execute the deed, it is unquestionably true that she was in dire need of assistance; that she was in very poor physical health; and that she was mentally confused and unstable. De-defendant Kathleen Shellabarger, who was the moving party in the transaction, stated that "she was attending to Mrs. Rumery's business," and the evidence shows that thereafter she did look after it. She selected counsel from her employers to give advice; she took decedent to the bank and assisted in the opening of an account; she arranged for decedent to obtain the money she needed upon the death of her husband; she attended to the funeral arrangements of decedent's husband; she voluntarily placed herself in a position of trust and confidence with relation to the affairs of Agnes Rumery. Mrs. Rumery unquestionably looked to defendants for comfort, advice, and assistance, and defendants were directly responsible for dispensing with the offered assistance of others. No showing is made that relatives of the aged woman or persons having a natural claim in her estate were in any manner consulted. The deed was secured even before the burial of Mr. Rumery, and at a time when even one of far greater physical and mental health than Mrs. Rumery possessed would be easily influenced.

Under the foregoing circumstances a fiduciary relationship is indisputably established. In *Dittbrenner v. Myerson*, 114 Colo. 448, 167 P. (2d) 15, we stated inter alia: "Where such a relation subsists between two persons, 'The law presumes in favour of the servient party, against the dominant party, (1) that the relation placed the dominant party in a position to exercise influence and dominion over the servient party; (2) that such influence and dominion operated upon, and procured, the transaction; and (3), that the influence was an improper

and unfair, or (to use the accepted phrase) an "undue influence".' Bower on Actionable Non-disclosure, p. 363, §405. '* * * when the relative position of the parties is such as prima facie to raise this presumption, the transaction cannot stand unless the person claiming the benefit of it is able to repel the presumption by contrary evidence, proving it to have been in point of fact, fair, just, and reasonable.' *Aylesford v. Morris,* 8 Ch. App. 484, quoted in Bower on Actionable Non-disclosure, p. 391, §428.

" 'The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation is shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed.' *Sears v. Hicklin,* 13 Colo. 143, 148, 21 Pac. 1022, quoting from Kerr, Fraud & Mistake 183."

In *Bentley v. Bentley,* 141 Md. 428, 119 Atl. 293, the Court of Appeals of Maryland applied the rule here applicable. In affirming the judgment of the trial court setting aside a deed in favor of one in a position of fiduciary relationship with the aged and infirm grantor the court said: "But the law does protect old and feeble people from being placed in positions that take away their freedom of action, and make it improbable, if not impossible, for them to carry out their wishes freely."

In Pomeroy's Equity Jurispudence (1st ed.), vol. 2, p. 478, section 956, we find a thorough analysis of the doctrine under which one endeavoring to retain benefits received from another, toward whom he stood in a position of trust, has the burden of proof to overcome the presumption of undue influence. Among other things we find the following statements:

"While equity does not deny the possibility of valid transactions between the two parties, yet because every

fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisities, and of thereby overcoming the presumption.

\* \* \*

" 'Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no such confidential relation had existed.*' Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists *as a fact,* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal."

Numerous authorities support this principle. We cite only a few. *Gresham v. Stacy,* 287 Ky. 321, 152 S.W. (2d) 960; *Cardenas v. Ortiz,* 29 N. M. 633, 226 Pac. 418; *Stahl v. Stahl,* 214 Ill. 131, 73 N.E. 319; *Verner v. Mosely,* 221 Ala. 36, 127 So. 527. In *House v. Smith,* 117 Colo. 305, 187 P. (2d) 587, we recognized the rule under discussion in the following quotation from the opinion in that case: "Defendant cites *Berlin v. Wait,* 71 Colo. 533, 208 Pac. 482; *Tost v. Smies,* 74 Colo. 435, 216 Pac. 545; and *Boyer v. Tait,* 78 Colo. 36, 238 Pac. 59; as evidencing

the rule that the burden of proof in establishing fraud and undue influence is upon him who asserts it and that it must be established by clear and satisfactory evidence. However, this rule must be construed in conjunction with the other rule, that fraud, in some situations, may be presumed from the relationship, or from the circumstances and condition of the parties contracting, to prevent one taking surreptitious advantage of the weakness or necessity of another, and that gross inadequacy of consideration will call for explanation and shift the burden to the party seeking to enforce an instrument and require him to show affirmatively that the price was the result of the deliberate and intentional act of the parties. *Dittbrenner v. Myerson,* 114 Colo. 448, 167 P. (2d) 15."

We consider the following quoted language from the opinion in *Bentley v. Bentley, supra,* which is applicable to the present case: "It is not inconsistent with the exercise of undue influence or artifice that the instrument assailed was executed voluntarily and with a knowledge of its contents."

It follows from the foregoing that the burden of proof upon the issue of undue influence rested upon defendants to establish that the transaction in dispute was in point of fact fair, just, and reasonable. The trial court erred in disposing of this cause upon the theory as indicated in the judgment, that the burden of proof was on the plaintiff upon the issue of undue influence.

The parties may desire to present further evidence or may elect by stipulation to submit the issues for reconsideration by the trial court upon the record as made, but in any event findings of fact should be entered with due regard to the correct rule governing the burden of proof.

The judgment is reversed and the cause remanded for further proceedings consistent with the views herein expressed.

Mr. Chief Justice Hilliard not participating.