| 13 | 143 |
| 15 | 491 |

SEARS v. HICKLIN.

1. FRAUD — VIOLATION OF TRUST AND CONFIDENCE. — Fraud, in an equitable sense, includes all acts, omissions and concealments which involve a breach of legal or equitable duty, as the violation of trust and confidence reposed in business relations, whereby an undue and unconscientious advantage is taken. .

2. MISREPRESENTATION OF FACT — REMEDY.— Where a misrepresentation of fact, of a material nature, is made to a person, who, relying upon the supposed truth thereof, is induced, to his injury, to enter into a transaction which it is reasonable to infer he would not otherwise have entered, it affords ground for setting aside the whole transaction; and it is no defense that the person to whom the misrepresentation was made might have learned of its falsity before acting thereon. Nor is it material in such case whether the

misrepresentation was fraudulently or mistakenly made. Unless it appears that the party claiming to have acted thereon actually knew it to have been untrue the result will be the same.

3. VIOLATION OF CONFIDENTIAL BUSINESS RELATIONS — RELIEF IN EQUITY.— Courts of equity do not require positive and express proof of fraud, but deduce evidence thereof from circumstances which afford strong presumptions. Accordingly where a woman unskilled in business matters, and possessing a limited knowledge of the English language, is possessed of a large body of lands, the descriptions of the several parcels whereof, as designated in the public surveys, she is not familiar, is induced to execute a deed covering several hundred acres, upon a wholly inadequate consideration, to a man skilled in business and land transactions, who had for years acted as her confidential adviser in respect to her lands, and who subsequently admitted that the deed included tracts which he had falsely represented to her were not included, the woman also testifying that the quantity conveyed far exceeded the quantity intended to be conveyed, and that the price obtained was much less than she was led to suppose she was to receive, it is proper for a court of equity to set aside the whole transaction as fraudulent throughout.

*Appeal from District Court of Pueblo County.*

Mr. J. M. WALDRON and Mr. CHARLES C. STEIN, for appellant.

Mr. C. E. GAST, for appellee.

REED, C. A suit in equity. Complaint filed by the appellee, Estefana Hicklin, plaintiff below, against the appellant, George Sears, defendant, to cancel and set aside a conveyance of some one thousand two hundred acres of land in the county of Pueblo, conveyed by plaintiff to the defendant on the 8th day of September, 1882; the said one thousand two hundred acres of land being a part of a larger tract containing five thousand one hundred and eighteen and seventy-two one-hundredths acres, awarded, confirmed and patented to plaintiff by the government of the United States under an act approved February, 1867, entitled "An act to amend an act entitled 'An act to confirm certain private land claims in the territory of New Mexico.'"

The complaint alleges that defendant, taking advantage of his superior knowledge of her affairs, and her known friendship and confidence in him, fraudulently induced her to convey the land in question; and alleges that part of the land conveyed was other and different land from that defendant informed her he was to have. That in two different instances his proposition was in regard to forty-acre tracts that he pointed out to her, and of which he showed her the boundaries, as he stated, at the time. That in the deed which she executed, relying upon his statements, the tracts, instead of being forty acres, in each case were one hundred and sixty acres. The different tracts of land were not located as he had stated to her that they were; were of much greater value than the land that he informed her that he was purchasing and she supposed she was selling. That the consideration of the deed, as appeared upon the face of it, was $3,000, and that she has always understood that to be the price that he was paying for the land. That she was largely indebted to him, and he had prior to that time caused her to execute and obtained from her a deed of trust upon her home property, known as the "Home Ranch," for something over $1,000; and that defendant claimed that, aside from such security, she was indebted to him in the sum of $1,200 or more, which was unsecured, and the payment of which he was urging. That her object in selling such land to the defendant was to pay him and relieve herself from such indebtedness, and she supposed that she was so doing. That the amount of $3,000, which she supposed she was receiving, would pay and discharge all the indebtedness due the defendant, including the amount secured by deed of trust, and leave her a small balance. That after the conveyance above mentioned was made to the defendant he only allowed her on such indebtedness, as full consideration for the whole one thousand two hundred acres of land, the sum of $925, and indorsed that amount upon the unse-

cured indebtedness due him by the plaintiff, leaving a balance on that, and still retaining the security upon the home place; alleging that defendant was guilty of fraud in misleading the plaintiff, misdescribing the property, obtaining a deed, and retaining the balance of the consideration between the sum of $925 and $3,000; and prayed that the transaction might be declared fraudulent, the conveyance canceled, and that she be allowed to return to defendant the sum of $925, and the interest on the same, for which he had given her credit.

A demurrer was filed to the complaint, which was overruled. Defendant answered, denying all the important allegations in the complaint, and for further answer set up various supposed defenses that we do not deem it necessary to consider in detail in determining this suit. The matter was referred to a referee to take and report the testimony. The evidence taken was very voluminous, the report being nearly one thousand four hundred manuscript pages. On the 6th day of May, 1885, a decree was entered declaring the deed executed by the plaintiff to defendant to have been fraudulently obtained, ordering it canceled, and that the credit of $925 given by defendant to plaintiff, and indorsed on the plaintiff's note, be annulled. Defendant prayed and perfected an appeal to this court.

The case appears to have been very ably and carefully tried, and this court in arriving at a decision is aided and assisted by able and carefully prepared briefs and arguments by respective counsel.

It is objected on the part of appellant, and assigned for error — *First,* that the court erred in overruling the demurrer on the first point, viz., that several causes of action had been improperly united in the complaint; *second,* that the complaint was ambiguous, unintelligible and uncertain; *third,* that the complaint did not state facts sufficient to constitute a cause of action.

The first two were waived by the answer. This objec-

tion is not urged in argument, and perhaps the third might be considered as abandoned, but we have preferred to examine it, and have concluded the objection to be untenable, and that the court was justified in overruling the demurrer.

The proper determination of the suit depends upon the findings on the two primary and fundamental questions or propositions: *First.* Were the business, social and general relations of plaintiff and defendant such as to cause the plaintiff to trust too implicitly in the statements and representations of defendant, and in his friendship, honesty and integrity, and did he knowingly and intentionally take advantage of the relations existing, and of her ignorance and confidence, and overreach and defraud her?

*Second.* Did the plaintiff by laches and culpable negligence, after being informed of all material facts, preclude herself from obtaining equitable relief in the premises?

To determine these questions requires an extended examination and analysis of the testimony. It must be conceded from the evidence that the relations had been for some years friendly and confidential. He had rented from her; carried on business on her premises; dealt with her quite extensively; had, as he admits, been consulted by her regarding her business affairs with others. Before her title to the land had been perfected, he interested himself in her behalf,— whether as friend or paid agent is not disclosed. As shown by his own letters, he, while at the national capital, assisted her, or claimed to have done so, by his influence and attention in securing a proper determination of her affairs, and the issuing of a patent to the entire grant. That she had visited him and he her in cases of sickness, and that he had for a long time visited her house on other occasions. That this condition of affairs might have existed without warranting a presumption of dependence or subserviency on

her part, and superior influence amounting to control on his part, must be admitted; but there are facts and circumstances that warrant the inference, not only that she was to a great extent subject to his control in business matters, but that he was aware of the fact, and did not hesitate to assume such control, and dictate to her the course she should pursue with others in her business affairs; notably his letter from Washington, bearing date June 13, 1882, in which he says: "Patents, I think, can be had soon. Do not say one word about it to any one outside of your family, and be sure to keep my name out of it at present. The President of the United States has to sign patents, and he will do it sure." And again, in his letter from the same place, of June 17, 1882: "Your papers for the five thousand one hundred and eighteen and seventy-two one-hundredths acres were sent to Bradford by the lawyer that Bradford has here. He is about like the old man; he thinks he is a big gun. If you see Bradford do not mention my name, and say nothing to any one about the matter,— not to any one. Do not pay or sign any papers. I will be home soon."

. When we see the character and tenor of these letters, wherein he dictates a course of action, and forbids her conferring with her own lawyer, we are not left in doubt of what he supposed their relations to be, and the results, we think, warrant his assumption at that time. The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation is shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed. Kerr, Fraud & M. 183; *Huguenin v. Baseley*, 14 Ves. 273; *Cooke v. Lamotte*, 15 Beav. 234; *Williams v. Bayley*, L. R. 1 Ch. App. Cas. 200. No general rule has been laid down as to what shall

constitute undue influence. The question must depend upon the circumstances of each case. *McCormick v. Malin*, 5 Blackf. 509; *Wilson v. Watts*, 9 Md. 356.

A great deal of contradictory and conflicting testimony was taken in regard to the ability of the plaintiff to speak, read and understand the English language; her intellectual and business capability; her disposition, whether confiding or suspicious; and in regard to her knowledge of the land by surveyed lines and legal subdivisions. It is evident that her knowledge of English was limited,— from nationality, habits and place of residence, it must have been; and it cannot, from her short life history as given, be presumed that she was a person of great mental ability, acumen or business capacity; and the testimony shows her to have been rather below than above the average of her sex in the same sphere of life. Experience teaches us that a want of proper information, worldly knowledge and knowledge of the English language would make a woman in her situation both overconfiding and oversuspicious, according to circumstances,— overconfiding in supposed friendship, and unduly suspicious of those against whom her friends advised her. And when, as is shown in this case, supposed friends, for their own purposes, intentionally added to her suspicion of others, the two supposed contradictory mental conditions can be understood. That she was with her supposed friends too confiding was demonstrated in the case of Dotson; and her supposed great business ability is negatived by that transaction, as well as by almost every phase of the transaction in this case. As to her knowledge of the surveyed lines, descriptions of legal subdivisions, and corners of the large tract of over five thousand acres, every presumption is against it. It requires a woman to have greater knowledge than could have been had by an active, intelligent business man, without surveys and personal inspection of every part of the ground. The defendant testified that she was familiar

with the lines, corners and descriptions. He also testified that a week or more before the execution of the deed he furnished her a written memorandum, containing the legal description of each subdivision she was expected to convey; that at the time the deed was executed she took the paper from her pocket and compared it with the descriptions in the deed. Whether such was the fact we are left in doubt. The evidence was very contradictory and evenly balanced. Admitting the fact, what was she to gain by the comparison? Both were papers of the defendant,— one handed to her; its duplicate handed to the party who drew the deed and by him copied into it. If she did not have sufficient knowledge of the land to apply the descriptions, and did not understand the descriptions, neither would aid her in ascertaining what property she was conveying. The only result to be obtained by the comparison would be that two papers furnished by the same party were or were not alike — a very useless and unimportant fact. Taking the testimony of the defendant on this point as a whole, it proves too much; for after testifying positively to her knowledge of the different tracts by the descriptions, and her comparison of the two papers, he informs us he found it necessary to take plaintiff to the door and point out the different tracts and their boundaries, as he had done on one or two occasions before; showing conclusively that she was not capable of getting the necessary information from the papers. Few business men could have taken the long list of descriptions and applied them understandingly, without platting and putting them together. To nearly all shrewd, educated, business American women the description of a large number of parcels of land by legal subdivisions only would convey no more meaning than if written in an unknown language. True, they might know that a half section should be more than a quarter, and a whole section more than a half; but take, for instance, the bare legal description of a tract as the north-

west quarter of the northwest quarter of a section, they would not know whether it contained forty, one hundred and sixty or three hundred and sixty acres.

Taking into consideration all the testimony and attendant circumstances, we are forced to believe she was not informed and had no definite knowledge of what she was conveying; and whether or not the tracts and boundaries pointed out in an indefinite manner from the door corresponded with those in the deed we have no means of knowing. If they did, we are forced to conclude that they were too general, vague and indefinite for the full understanding and comprehension of the plaintiff.

The defendant testified that he had been in the neighborhood since 1872. From that date to 1875 he had resided on the land of plaintiff at the crossing, and sold goods. He then removed two and a half miles south, where he had continued to reside. During all these years he must have been familiar with the land of the plaintiff (he testified that he was); and having been connected with obtaining patents to it, been counseled by plaintiff in regard to lands sold by her to others, and having carefully examined the land preparatory to making his own purchase, and being capable, as he assumed to be, of pointing out to plaintiff lines and corners, we must conclude, from his own testimony, that he intentionally and fraudulently misrepresented the lines and boundaries of the southwest quarter of section 24, and obtained land that he admits was to be excluded by the contract — the grave-yard and the creek crossing. The grave-yard where her husband and perhaps other members of the family have been buried was to her sacred ground,— land she could not be induced to sell; while the crossing she wished to retain on account of its supposed value. He is compelled to admit that he informed her that they were not upon the tract he was purchasing. The proof was that the tract included both, and

that the grave-yard was two hundred and seventy yards from the east line. If any further evidence was needed of plaintiff's utter want of knowledge in regard to lines and corners of her land, this fact would supply it. Where, as in that case, there is an admitted discrepancy, the presumption is that other statements were not more accurate. It is a well-settled rule in equity that a misrepresentation, to be of avail as a ground for relief, should be of a material nature. There must be an assertion of the fact on which the person entering into the transaction relied, and in the absence of which it is reasonable to infer the party would not have acted. Where these two facts concur, it is unimportant whether the misrepresentation was fraudulent or otherwise. In *Rawlins v. Wickham*, 3 De Gex & J. 317, Turner, L. J., says: "If, upon a treaty for purchase, one of the parties to the contract makes a representation materially affecting the subject-matter of the contract, he * * * cannot be allowed to retain any benefit which he has derived if the representation he has made turns out to be untrue," and that no man can be held to what he has done under circumstances which have been erroneously represented to him by the other party to the transaction, however innocently the representation might have been made.

The inquiry is not whether the party making the statement knew it to be false, but whether the statement made as true was believed to be true, and deceived the party to whom it was made. *Joyce v. Taylor*, 6 Gill & J. 54; *Lockbridge v. Foster*, 4 Scam. 569; *Hazard v. Irwin*, 18 Pick. 95; *McFerran v. Taylor*, 3 Cranch, 270.

Where there has been a misrepresentation, whether made fraudulently or mistakenly, it is no defense that either party by diligence might have learned of its falsity. The well-settled rule is that the party must show, not only that the other might have known, but actually did know, the statement to be untrue, and must establish

the fact upon incontestible evidence, and beyond the possibility of a doubt. *Dyer v. Hargrave*, 10 Ves. 505; *Vigers v. Pike*, 8 Clark & F. 562; *Boyce v. Grundy*, 3 Pet. 210; *Connersville v. Wadleigh*, 7 Blackf. 102.

After careful examination of the testimony, and consideration of the facts and circumstances of the case, we think the learned judge was warranted in finding that the conveyance was fraudulently obtained, and should be canceled. It is true that the testimony is conflicting, but we think the weight of evidence is clearly in support of the finding. "Fraud, in the sense of a court of equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." 1 Story, Eq. Jur. p. 186; *Chesterfield v. Janssen*, 2 Ves. Sr. 155.

Courts of equity do not require positive and express proofs of fraud, but deduce them from circumstances affording strong presumptions. In this case the proof on some points is positive and express. If it were not, the attendant circumstances were such as not only to allow fraud to be presumed, but were such as to warrant the belief that there was a long-entertained intention on the part of the defendant, and a studied policy followed leading up to its accomplishment. The relation of the parties was such, and the great disparity in business ability such, that had the defendant wished to deal with her honestly and fairly, to avoid all imputation of unfairness, he should not have allowed the transaction to have been consummated quietly, hastily and secretly, only in the presence of his own friends. He should have dealt at arms-length, not only allowing but requiring her to have her friends and legal advisers present.

Having found that the deed was obtained by fraud, it is unnecessary to consider whether the second fraud was perpetrated in the amount of the consideration paid.

The weight of the testimony clearly establishes the inadequacy of the consideration, and it is apparent from the evidence that it was not the amount that plaintiff understood she was to receive and expected. Equity looks to circumstances and evident intention of parties. Her intention was to relieve herself from the indebtedness and release her home, and, though not shown to have been an able, practical woman, it cannot be supposed that she intended to convey the large number of acres she did for the small amount allowed, leaving the balance of her property at defendant's mercy, to be absorbed by him at pleasure on the trust deed and unsettled balance of account.

Plaintiff's deed of conveyance was made September 8, 1882. The complaint was filed January 29, 1884. Some sixteen months elapsed from the time of making the deed to the bringing of suit, but neglect or delay in bringing suit to avoid a fraudulent transaction can only be imputed from the time the party had knowledge of the fraud. The rule of equity is that a man who seeks the aid of the court must assert his claim with reasonable diligence. *Piatt v. Vattier*, 9 Pet. 405; *Wade v. Pettibone*, 11 Ohio, 57.

What is reasonable diligence is not and cannot be defined by any general rule. No precise or definite limit of time can be stated within which the interposition of the court must be sought. What is reasonable time must in a great measure depend upon the exercise of the sound discretion of the court, under the circumstances of each particular case. *Hawley v. Cramer*, 4 Cow. 717; *Hallett v. Collins*, 10 How. 174. On examining the authorities, no like case is found where relief was refused, unless a much greater time had elapsed. The time in which the courts have treated demands as stale varies from four to twenty years, depending upon the character of the case. We are not definitely informed when plaintiff first had knowledge of the fraud, but if known imme-

diately after the conveyance, when the situation and circumstances of plaintiff are considered, we think the court was warranted in finding that there had not been such unreasonable and negligent delay as to bar her right to relief. The decree should be affirmed.

RICHMOND and PATTISON, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment is affirmed.

*Affirmed.*