the United States District Court for the District of Maryland,

Ordered that the motion to dismiss defendant Time, Inc., for lack of *in personam* jurisdiction be, and it is hereby denied; and it is further

Ordered that the motions to dismiss defendants Conway, Watters, and Ananian be, and they are hereby granted; and it is further

Ordered that the motions of defendants Time, Inc., Family Publications Service, Inc., and Kingston to dismiss as to Elizabeth F. Hare be, and they are hereby denied; and it is further

Ordered that defendant Family Publications Service, Inc.'s motion to strike is hereby denied as to paragraph 20 of the third amended complaint, and granted as to paragraph 24 of the third amended complaint; and it is further

Ordered that plaintiffs' motion to amend the third amended complaint be, and it is hereby, denied; and it is further

Ordered that the plaintiffs shall file a fourth amended complaint in accord with Part VII of the memorandum opinion herein; 20 days leave shall be granted to file said complaint.

Marguerite **IRWIN** et al., Plaintiffs,

v.

**WEST END DEVELOPMENT COM-PANY, a Colorado corporation, et al., Defendants.**

Civ. A. No. C-2941.

United States District Court,
D. Colorado.

May 12, 1972.

As Amended on Denial of Rehearing
June 23, 1972.

Shellman, Carney & Edwards, by Dwight K. Shellman, Jr., and William J. Carney, Aspen, Colo., for plaintiffs.

Helmick, Conover & Burkhardt, by Frederic K. Conover, II, and Kenneth L. Keene, Jr., Denver, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

The individual plaintiffs, all of whom are citizens of states other than Colorado, and all of whom are retired or soon to be retired Army nurses, are minority stockholders in West End Development Company, a Colorado corporation. They seek to enforce against Roy Vroom, a Colorado citizen, rights to purchase stock in that company worth more than $10,000.00. As stockholders, they bring a derivative action against Roy Vroom as president, director and dominant stockholder of the company to force him to re-

pay a $15,000.00 salary to the company, and they ask other derivative relief to be discussed later. The story unfolds.[1]

In 1957, Marguerite Irwin and Ada Rock[2] came to Aspen on a vacation, and they looked into the possibility of purchasing a small lodge in the area to operate after their retirement from the Army. Defendant Roy Vroom (in partnership with his brother, Jacob Vroom) maintained a real estate office in Aspen, and the two visiting Army nurses chanced into the Vroom real estate office to inquire about the availability of a lodge which they might buy. Vroom touted them into a joint venture with his brother and himself to purchase about 30 acres of undeveloped real estate just outside Aspen. The land was bought from Friedl Pfeiffer for $45,000.00, with $18,000 to be paid at time of purchase and the balance to be paid over a ten year period. One-half of the downpayment was to be put up by Marguerite Irwin, Ada Rock and June M. Lease, and the other half was to be be paid by Vroom Realty and Theodore Gordon, but the total payments to be made by Vroom Realty and Gordon were $18,000.00 each. The interests were to be held:

|  |  |
|---|---|
| Irwin, Rock and Lease, collectively | 20% |
| Vroom Realty | 40% |
| Gordon | 40% |

To come up with $7,500 of their $9,000.00 share of the downpayment, with prior approval of the other investors being obtained, Vroom Realty and Gordon sold a 5% interest to Julia Crowley (nee Graves) and another 5% interest to Lois McCaleb.

A joint venture or syndicate agreement was entered into which provided in material part:

"No party may sell or assign his interest herein or any fractional portion thereof without first offering his interest or fractional portion to the other parties, in writing, and allowing them, or any one of them, 15 days to meet his price, in cash, the name of the proposed purchaser being disclosed. No party shall thereafter sell his interest or any fractional portion thereof to anyone at less than the above offered price. Otherwise the interests or any fractional portion thereof shall be freely assignable."

Prior to consummation of the purchase of the land, Vroom Realty assigned 10% of the deal to Ewing R. Taylor, Jr. and his wife, Ann Turlock Taylor, for $10,000.00, and again, notices were sent to the other investors in accordance with the quoted provision of the syndicate agreement. In 1960, Vroom Realty borrowed $8,000.00 from Mr. and Mrs. Taylor and a 10% interest in the syndicate was put up as collateral for the loan. When the loan was not repaid, an outright conveyance of the pledged 10% interest was made to the Taylors.

In 1961, a disagreement arose between the Vrooms and Gordon, and Roy Vroom recommended to the other investors that an informal partition of the property be approved. At that time, Gordon owned a 35% interest in the venture [his original 40% less his share of the interest sold to Crowley and McCaleb.] By his letter of March 9, 1961, Roy Vroom told the other investors of the dispute and of his recommendations. He said:

"As we (my brother and I) have declared in the past, we have pledged to advise you of any significant development effecting the property. (sic) In the interest of unanimity we would appreciate your approval by signing and returning this letter to my office."

All of the investors approved, and 10 and a fraction acres were conveyed to Gordon to terminate his relationship with the venture.

---

1. Facts and conclusions contained in this opinion are facts found and conclusions made by the Court pursuant to the requirements of Rule 52.

2. Ada Rock is not a party to this case, presumably for the reason that she is a Colorado citizen, and her presence would destroy diversity of citizenship. She has a case pending in a Colorado state court.

At about this time, the partnership of Roy Vroom and Jacob Vroom came to an end, and in 1962, the Vroom Realty interest in the venture was transferred to Roy Vroom in settlement of the partnership accounts. No notice of this transfer was given to the other investors. This was at about the same time that Roy Vroom's then attorneys were worried about title problems in event of a sale of the real estate owned by the joint venture, and they recommended that the syndicate be incorporated to permit easier conveyance of marketable title. All participants in the venture approved this recommendation, and West End Development Company was incorporated on August 21, 1963, to take over for the joint venture, with stock being issued in accordance with the individuals' percentage ownership of the syndicate. As will be seen before this opinion is concluded, three paragraphs of the Articles of Incorporation are of importance to the resolution of this lawsuit.

The objects and purposes of the corporation are set forth in Article III, Paragraph I:

"To engage in and carry on the business of buying, leasing or otherwise acquiring real estate of every kind and description, to construct and erect, or contract for the construction or erection of buildings and structures in or upon any of said real estate for any uses and purposes; to own, hold, improve, develop, subdivide, maintain, operate, lease, sell or otherwise dispose of all or any of said real estate or any part thereof."

The restrictions on transfer (which Vroom testified in the course of his deposition received in evidence were intended to restate the restrictions contained in the joint venture agreement) appear in Article IV, paragraph 6:

"No shareholder shall sell or transfer any outstanding shares of the capital stock issued by the corporation to such shareholder, excepting to the other shareholders, *in the proportion which the number of shares owned by each bears to the total shares outstanding*,

without the prior consent of the owners of at least two-thirds (⅔) of the shares entitled to vote at shareholders' meetings, subject, however, to Paragraph 7 of this Article." [Emphasis supplied]

Article VIII, Paragraph 1 has to do with contracts between the corporation and its officers or directors. It says:

"No contract or other transaction of the corporation with any other person, firm or corporation, or in which this corporation may be interested, shall be affected or invalidated by:

"(a) the fact that any one or more of the directors or officers of this corporation may be interested in, or is a director or officer of, any other corporation; or

"(b) the fact that any director or officer, individually or jointly with others, may be a party to, or may be interested in, any such contract or transaction. Each person who may become a director or officer of the corporation is hereby relieved from any liability that might otherwise arise by reason of his contracting with the corporation for the benefit of himself or any firm or corporation in which he may in any way be interested."

■ Read literally, Article IV, Paragraph 6 of the Articles having to do with the sale of shares in the corporation is nonsensical. It says that the other shareholders have a right to share in the purchase of a selling stockholder's stock "in the proportion which the number of shares owned by each *bears to the total shares outstanding*." The impossibility of giving literal application to this provision may be illustrated by assuming a corporation with 100 shares outstanding owned 30 shares by A, 25 shares by B, 20 shares by C, 15 shares by D and 10 shares by E. If A wanted to sell his 30 shares, B would have a right to buy 7.5 shares, C would have a right to 6 shares, D could buy 4.5 shares and E could buy 3 shares—a total of 21 shares, and 9 shares would be left out in space. Ob-

viously, the scrivener who drafted the articles meant to say "in the proportion which the number of shares owned by each *bears to the total shares not offered for sale.*" A court must interpret the articles in a way which will give them a reasonable meaning, and defendant Vroom testified that it was intended in the articles to carry forward the provisions of the syndicate agreement which made provisions for a workable result and for the result necessarily intended by the draftsman of the corporate articles.

With this interruption in our story we return to develop the facts occurring after incorporation of the venture. The Buttermilk ski area was started near the land, and it, coupled with the public's enthusiasm for skiing, caused the value of the land to skyrocket. Vroom, who was well aware of the land's value, made some attempt to buy the nurses' stock for $600 per share in 1965, and for $750 a share in 1967. The nurses had no knowledge of Aspen real estate values because their professional status resulted in duty assignments throughout the world, and they relied on and trusted Vroom to manage the property and to advise them concerning its development or disposition. [Vroom freely admitted plaintiffs' trust and reliance on him.] Yet, although Vroom had suggested a $600 per share price to the uninformed, far distant nurses in 1965, on September 9 of that same year, he purchased the 30.76 shares owned by the Taylors for $31,536.00—a price per share of $1,025.-22. The nurses were not notified of this purchase, and they were given no opportunity to participate therein. Vroom's explanation of his failure to tell them about the transaction was that he had never read the articles of incorporation. This explanation hardly comports with the notices he gave during the life of the syndicate and his admission that Article IV, Paragraph 6 of the Articles of Incorporation were intended to carry forward the provisions of the joint venture agreement. Nor is it easy to accept in light of his present insistence on lit-

eral enforcement of other provisions of the articles. His advice to plaintiff Lease two years later that her stock was then worth only $750.00 per share does little to add credence to Vroom's claims, and it is apparent that he not only did not give plaintiffs an opportunity to share in the purchase of the Taylor stock, but that he consciously concealed that stock purchase from them.

On August 22, 1967, Vroom wrote the nurses calling a special stockholders' meeting for September 6, 1967. In his letter he said that he wanted to develop a small portion of the company land as "a recreational facility consisting of tennis courts, swimming pools, club house, restaurants and related facilities." He assured them that "the property would be leased to either a group, who would then finance and develop the facility, or to an individual such as myself. . . . Of course, the property will be leased, based on a percentage of the current value of the property." It comes as no surprise to learn that none of the plaintiffs were able to leave their duty stations to attend the meeting, although Ada Rock did manage to be present. The minutes of the meeting show nothing concerning details of the plan, but they recite that "All parties were in accord with the proposed project, and it was agreed that we would proceed as soon as the various details were finalized."

In 1968, Vroom's former attorneys resigned as directors of the company, and defendants Sabin and Powers, both employees of Vroom, replaced them as directors. The extent of Sabin's and Powers' knowledge of and participation in company affairs is dubious to say the least. Nothing much happened until April 15, 1969, when Vroom wrote the other stockholders saying that he was negotiating a sale or a lease for the development "of the acreage owned by West End Development Company." He said that there were three possibilities, (a) a sale of the land, (b) a lease of the land, or (c) a participation in the development whereby the company would contribute the land as its share of the devel-

opment cost. Enclosed with this letter was a consent to be signed by the stockholders, but their consents were not forthcoming.

Vroom did negotiate with one David Hoffman to form a limited partnership to develop the entire property, and a draft of the proposed limited partnership agreement was drawn. It said that the entire property was to be developed as "a tennis and swim club, retail shopping mall and residential community." The recited agreed value of the real estate was $30,000 per acre, and, although Vroom was at all times willing to sign the agreement, the deal fell through when Hoffman lost interest. Vroom was an avid tennis enthusiast who played four or five days a week, and his desires to play tennis were not to be frustrated by either Hoffman's loss of interest, the corporation's lack of money, or the nurses' failure to approve the plan. Accordingly, on June 4, 1969, the board of directors authorized "the West End Development Co. to proceed with the construction of a Tennis and Swim Club." The resolution provided:

". . . the funds necessary for the initial phases would be advanced by Roy Vroom, personally, until such time as other satisfactory arrangements can be made by financing through a lending institution or until the West End Development property is sold, leased, or a participation arrangement is made whereby West End Development Co. participates with a developer. At that time, Roy Vroom will be reimbursed, in full, together with interest at bank rates. *Should West End Development Co. elect to operate said facilities, in that event Roy Vroom will be reimbursed from the gross income derived from said operation,* prior to any distribution of profits or dividends made to the stockholders of the West End Development Co., plus interest . . . . It was further agreed to renew the Exclusive Listing Agreement with Roy Vroom Realty." [Emphasis supplied]

Work on the tennis courts started and Vroom loaned the corporation $39,216.91. The economic study to support the expenditure deserves quotation from the portion of Vroom's deposition offered by defendant:

"Q. Did you inquire into the economics of the tennis operations that were in existence in Aspen at that time"

"A. No.

"Q. Did you inquire into the economics of tennis clubs generally?

"A. Not specifically, any specific tennis club, per se. I had an idea of what they cost to build, and approximately how much income they would produce.

"Q. Where did you get those ideas?

"A. From what I had to pay for a tennis court to play on it, and from people that built tennis courts in the past as to what they paid for them.

"Q. People in the Aspen area who had built tennis courts?

"A. No, in Denver."

Testimony at time of trial demonstrated that the income projections were little more than doodling, and, predictably, the tennis courts have lost money under the operation of West End Development Company. Of course, the resolution of June 4, 1969, said that if the company operated the courts, "Vroom will be reimbursed from the gross income derived from said operation," but that isn't the way it has worked out. Less than four months after the June 4, 1969, resolution, another resolution signed by Vroom as president and Powers as secretary [Sabin did not sign these minutes] authorized the borrowing of $75,000.00 from the Bank of Aspen with the tennis court site to be encumbered as security. The resolution said that "the purpose of the loan is to reimburse Roy Vroom for the advance of funds made by him to West End Development Company, plus interest at 9% per annum. Any funds remaining after Roy

Vroom is paid in full will be used to improve the tennis club site further."

To the extent that the resolution commanded the repayment of Vroom's loan plus 9% interest, it was carried out, and Vroom was paid $42,345.15. [$39,216.81 principal plus $3,128.24 interest.] Not all of the remaining loan proceeds of $32,654.85 can be said to have been "used to improve the tennis club site further," because on March 23, 1970, Vroom and Powers voted [Sabin did not sign the minutes] to spend $15,000.00 of the loan proceeds to pay Vroom a $15,-000.00 per year salary, retroactive to March 15, 1969, and this by a corporation which was losing money according to its financial records and tax returns. The minutes of this meeting show that Vroom was paid, "as manager of the West End Development Company, Inc. affairs and the Aspen Racquet Club." It was agreed that "a salary of $15,000.00 per year be paid to Director Roy Vroom, *which salary shall be increased from time to time as the duties connected with the companies' activities increase.*" [The emphasis is added to emphasize that the company's ability to pay was the farthest thing from Vroom's mind.] Of course, the nurses knew nothing of these shenanigans.

We backtrack a little in the telling of this sordid tale. By the spring of 1969, the nurses were becoming disenchanted with Vroom's lack of progress in selling the property and with the total absence of income being derived from their by then 12-year old investment. His reports to them over the years had been sporadic and uninformative, and Marguerite Irwin met Ada Rock in Aspen for the avowed purpose of employing an attorney to look into the matter and to find out what had been going on and to obtain legal advice as to what they could and should do. Although plaintiffs' professional skill is attested by the fact that no plaintiff is retiring from the Army at a rank lower than major, their continuing lack of business acumen is attested by a visit they made to Vroom's office before they consulted an attorney. He assured them that all was in order, and he persuaded them that because Aspen is a small town in which gossip travels rapidly, they should not talk to an Aspen attorney. [Vroom told them that such gossip would lessen the land's sales price.] Instead, and still innocently acting on their misplaced trust in Vroom, they followed his recommendation and consulted the Denver attorneys for West End Development Company. Those attorneys conferred with Irwin and Rock, and a member of the firm accepted appointment under a power of attorney which, among other things, said that he should do anything "required or desirable in connection with the following matters:

"1. The interpretation, enforcement, amendment, modification, termination or cancellation of any agreements, rights or obligations which the said Marguerite Irwin may now or hereafter have relating to her interest in shares of stock in West End Development Co. . . ."

Identical powers of attorney were executed by all of the nurses and accepted by the attorney. Plaintiffs did not know the difference between an attorney in fact and an attorney at law, and they relied on the attorney as their attorney at law to protect their interests. Counsel for defendants have said that they did not think that they were acting as attorneys at law, and that the document was executed to facilitate a transfer of the nurses' stock in event of a sale of the corporation. The power of attorney does say that the attorney can do anything in connection with "the signing, making, executing, and delivering of all documents and matters in connection with the shares of stock owned by (the named nurse) in the said West End Development Co. and any interests which she may have or acquire in and to the assets of said corporation," but, although each nurse delivered her stock certificate to the attorney, none of the stock certificates were endorsed.

■ Whatever may have been the technical legal status of the attorney, one thing is abundantly clear. The attorney had the power [if not the duty] to enforce any agreement the nurses had relating to their interests in shares of stock of West End Development Co. This the attorney selected by plaintiffs in reliance on Vroom's recommendation did not do, and it comes with poor grace for Vroom to say that plaintiffs' claims now are barred by a statute of limitations which defense, even under Vroom's view of the facts, would not have been available if the attorney presently asserting that defense had acted.[3]

Totally apart from any claim of a defense of the statute of limitations, the record reflects that during the life of the power of attorney, plaintiffs and the attorney received a most unusual financial statement from Vroom supposedly setting forth the financial affairs of the company. The transmittal letter is dated April 8, 1970, and, although this was subsequent to the authorization of the $15,000.00 salary to Vroom, retroactive to March, 1969, no mention is made of that salary. This statement is remarkable in many respects, but perhaps most noteworthy is its treatment of the value of the land. Rental income from the land (there were some old improvements on it and it had been rented for grazing) is treated as a deduction from the value of the land. No question was raised by the attorney in fact then supposedly representing plaintiffs concerning the unusual accounting methods disclosed in the financial statement.

Finally, plaintiff did consult another attorney, and this lawsuit was filed March 1, 1971.

According to the company's records, after the partition of the land taken by Gordon, after the dissolution of Vroom Realty, and before the Taylor transaction, the number of shares of stock held by each stockholder was:

| | |
|---|---|
| Ann Taylor | 15.38 |
| Ewing Taylor | 15.38 |
| Roy Vroom | 23.08 |
| Marguerite Irwin | 10.253 |
| June Lease | 10.253 |
| Ada Rock | 10.253 |
| Julia Crowley | 7.69 |
| Lois McCaleb | 7.69 |
| Total Shares | 99.979 |

■■ Plaintiffs assert a right to a pro rata purchase of the 30.76 shares involved in the Taylor acquisition by Vroom and in the stock of Vroom Realty set over to Roy Vroom on dissolution of the partnership. We reject plaintiffs' contention as to the Vroom Realty stock for the reasons that we do not believe that either the syndicate agreement or the articles of incorporation contemplated that a settlement of partnership accounts on dissolution required an offering of the stock to other stockholders. Both the syndicate agreement and the articles refer to a sale, and counsel freely acknowledged at time of trial that the agreement would not cover an inheritance. We recognize that a debt from Jacob Vroom to the partnership was forgiven as a part of the transaction, but the transfer from Vroom Realty, a partnership, to Roy Vroom, a partner, was not a sale when that transfer was accomplished as a part of the partnership's dissolution and settlement of the partners' accounts. Moreover, any claim plaintiffs might have to share in this 10-year old partnership distribution of stock is barred under applicable Colorado statutes of limitation.

■ In considering the statute of limitations defense interposed by defend-

---

3. Although we later find that plaintiffs' suit was timely filed, defendant would be estopped to count as part of the time period the year during which his personally selected attorney for plaintiffs failed to act. Johnson v. Neel, (1951) 123 Colo. 377, 229 P.2d 939, infra; General Acci-

dent Fire and Life Assurance Corp. v. Mitchell, 128 Colo. 11, 259 P.2d 862; Mabray v. Williams, 132 Colo. 523, 291 P.2d 677; Jacobs v. Perry, 135 Colo. 550, 313 P.2d 1008; Crawford v. McLaughlin, 172 Colo. 366, 473 P.2d 725.

ant to plaintiffs' claim of a right to share in the Vroom Realty stock and the Taylor stock, there are three statutes which may possibly apply: (1) 1963 C.R.S. 87–1–11 is a six year statute applicable to contract actions; (2) 1963 C.R.S. 87–1–10 is a three year statute running from discovery, and it is made applicable to bills of relief on grounds of fraud and (3) 1963 C.R.S. 87–1–15 is a five year statute made applicable to "Bills of relief, in case of the existence of a trust not cognizable by courts of common law." The parties both say and the Court agrees that the five year statute is applicable. Farris v. Wirt (1901) 16 Colo.App. 1, 63 P. 946.

As we have earlier noted, the claim to share in the Vroom Realty stock is barred under any of the statutes which have been listed. However, when we come to the purchase by Roy Vroom of the Taylor stock, we have a different situation. The contract of purchase was dated September 9, 1965, and suit was filed March 1, 1971. However, Vroom did not receive the Taylor stock until a time well within either statutory period. Accordingly, neither the five nor the six year statute bar the action, and the case would not be barred under the three year statute because as to the Taylor sale to Roy Vroom, plaintiffs did not have knowledge of the sale, nor did they have knowledge of facts which would put a reasonable person on notice. Moreover, our later discussions of estoppel and breach of fiduciary duty apply to the limitations defense.

In seeking to resist the imposition of a trust on a portion of the Taylor stock, defendant falls back on two more lines of defense. He says, (a) that restrictions on the sale of stock are against public policy and void; (b) that the Colorado stock transfer act required that the certificate itself show the restriction, and that absent such legend on the stock certificate, the stock could be freely bought and sold.

Reasonable restrictions on the sale of corporation stock are not against

public policy and they are not void. Seventy years ago Justice Holmes said in Barrett v. King, 181 Mass. 476, 63 N.E. 934:

"Stock in a corporation is not merely property. It also creates a personal relation analogous otherwise than technically to a partnership . . . there seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm."

Colorado has judicially and legislatively approved of restrictions on the sale of stock. Sterling Loan & Inv. Co. v. Litel, 75 Colo. 34, 223 P. 753; 1963 C.R.S. 31–3–2(1) (j). The Congress of the United States, and most recently the United States Supreme Court have approved restrictions on the sale of stock. Affiliated Ute Citizens of Utah et al. v. United States et al., 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 [Decided April 24, 1972] relies on the Congressionally created restriction. The restrictions here in question are reasonable and they are enforceable unless defendant can prevail on his defense of failure to comply with the provisions of the stock transfer act.

As of September 9, 1965, Colorado law [1963 C.R.S. 31–11–14] provided:

"There shall be no lien in favor of a corporation upon the shares represented by a certificate issued by such corporation and there shall be no restriction upon the transfer of shares so represented by virtue of any by-law of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated upon the certificate."

As part of Colorado's adoption of the Uniform Commercial Code, this section was repealed in 1965, effective July 1, 1966. The obvious purpose of the section was to make ineffective restrictions on transfers to persons without notice. Had the Taylors sold the stock to innocent purchasers, the notice missing from the stock certificates would have rendered the restriction invalid as

to the innocent purchaser, but no notice is better than actual knowledge, and Vroom is charged with actual knowledge of the restriction. He signed the joint venture agreement. He gave notice under the joint venture agreement. He testified that the articles of incorporation were intended to carry forward the restrictions contained in the joint venture agreement. He signed the articles of incorporation, although he claims not to have read them. On November 1, 1963, he signed the Taylor stock certificates as president and he owed a duty to see to it that the restriction was placed on those certificates. He consciously concealed his purchase of the Taylor stock from plaintiffs. He cannot take advantage of his own wrongs to further injure the stockholders as to whom he occupied a fiduciary relationship. Sankin v. 5410 Connecticut Ave. Corp. (1968) (D.C.D.C.) 281 F.Supp. 524; Baumohl v. Goldstein (1924) 95 N.J.Eq. 597, 124 A. 118. Had the Uniform Commercial Code been in effect in 1965, instead of in 1966, there would be no argument available to defendant. 1963 C.R.S. 155–8–204, which replaced 1963 C.R.S. 31–11–14, expressly says:

> "Unless noted conspicuously on the security, a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective *except against a person with actual knowledge of it.*" [Emphasis supplied]

█ The new statute represented a change in phraseology, but not in the practical effect of the statute. Age Publishing Co. v. Becker (1943) 110 Colo. 319, 134 P.2d 205 must be read to say that on the facts here present, the failure to note the restriction on the certificates is no bar to its enforcement against Roy Vroom who had actual notice of it. And, all else aside, Roy Vroom is estopped from setting up the absence of the restriction from the face of the stock certificate as a defense. Colorado law of estoppel applies. Liberty National Bank & Trust Company v. Bank of America National Trust & Savings Association (1955) (10 Cir.) 218 F.2d

831. Colorado has gone far in applying the law of estoppel. In Johnson v. Neel (1951) 123 Colo. 377, 229 P.2d 939, it was said:

> "We are of the opinion that under the peculiar facts of this case the doctrine of estoppel in pais is applicable and controlling. This doctrine is founded upon principles of fair dealing and is designed to aid the law in the administration of justice where without its aid, injustice might result. In 19 American Jurisprudence, page 640, we find the following statement: 'Generally speaking, however, equitable estoppel is a rule of justice which in its proper field prevails over all other rules.' *The doctrine of equitable estoppel has been invoked to cut off rights or privileges conferred by statute, and constitutional rights may be effectively waived by conduct consisting of action or failure to act.* (citations omitted) 'A statute cannot stand in the way of waiver or equitable estoppel when the facts demand their application in the interest of justice and right.' Kalloch v. Elward, [118 Me. 346, 108 A. 256]."

Other Colorado cases which require that defendant be estopped from asserting this defense are, General Accident Fire & Life Assur. Corp. v. Mitchell, 128 Colo. 11, 259 P.2d 862; Mabray v. Williams, 132 Colo. 523, 291 P.2d 677; Jacobs v. Perry, 135 Colo. 550, 313 P.2d 1008, and Crawford v. McLaughlin, 172 Colo. 366, 473 P.2d 725. Roy Vroom the president, a director and the trusted manager of West End Development Company was a fiduciary as to the other stockholders. Homestake Mining Co. v. Mid-Continent Exploration Co. (1960, 10 Cir.) 282 F.2d 787; Herald Co. v. Bonfils (1970, D.C.Colo.) 315 F.Supp. 497; Hudson v. American Founders Life Ins. Co. (1963) 151 Colo. 54, 377 P.2d 391, and United States v. Gates (1967, 10 Cir.) 376 F.2d 65. He breached his contractual and his fiduciary duties to plaintiffs when he purchased the Taylor stock without honoring the agreement he had made to permit the other stockholders to

share in the purchase. They are entitled to share in that purchase at the price Roy Vroom paid, and a constructive trust is imposed on the 30.76 shares of stock purchased by Roy Vroom from Ewing and Ann Taylor.

The arithmetic of the constructive trust works out as follows:

| Stockholder | Shares owned divided by total outstanding less Taylor stock. | Percentage of shares outstanding less Taylor. | Shares of Taylor stock to which each stockholder is entitled. |
|---|---|---|---|
| Vroom | 23.08/69.219 | 33.34 | 10.2553 |
| Irwin | 10.253/69.219 | 14.81 | 4.5555 |
| Lease | 10.253/69.219 | 14.81 | 4.5555 |
| Rock | 10.253/69.219 | 14.81 | 4.5555 |
| McCaleb | 7.690/69.219 | 11.115 | 3.4191 |
| Crowley | 7.690/69.219 | 11.115 | 3.4191 |
| | | 100. | 30.76 |

■ As has been noted, the purchase price per share of the stock purchased by Vroom from the Taylors was $1,205.-22, and the other stockholders are entitled to purchase the shares above indicated from Roy Vroom at that price plus interest at the rate of 6% per annum from September 9, 1965, to the date such purchase is made by the other stockholders.[4] Plaintiffs shall have 30 days from the date judgment in this case becomes final within which to exercise their rights to purchase, and pending the expiration of that 30 day period, the stock which plaintiffs are entitled to purchase is impressed with a trust in their favor.[5]

Plaintiffs have not heretofore formally tendered the purchase price to Roy Vroom, but it was implicit in all of the testimony in the case that they were willing to buy the stock at the price they now know was a bargain price. Moreover, Vroom testified that he would not have accepted any tender and that he denied that plaintiffs had any right to share in the Taylor stock. Plaintiffs certainly could not be expected to tender

their pro rata share of the purchase price while the fact of purchase was being concealed from them by Vroom, and after they found out about the deal, it was manifest that he had planted his feet and that a tender would have been a meaningless act. There was no requirement for tender until Vroom notified plaintiffs that they could share in the purchase, and it has taken this trial to establish plaintiffs' rights.

■ We pass now to a consideration of the derivative claims. Prefatorily it should be noted that although the complaint may be somewhat defective under Rule 23.1, all pleadings were merged into the pretrial order, and it is abundantly clear from that order and from the conduct of the trial that all parties knew that they were going to trial on the derivative claims. Undeniably, plaintiffs made no demand on Roy Vroom and his personal secretary that the corporation assert these claims, but if ever there were a case in which such a demand would have been futile, this is that case. Judge Doyle discussed the necessity under Rule 23.1 for a futile demand in deHaas v. Empire Petroleum Company (D.C.Colo.1968) 286 F.Supp. 809, and he held that a demand was not necessary. He said:

"We conclude that the defendants so dominated American Industries, Inc. that a demand on its board of directors would probably have come to naught; that in the long run it would have been a futile and useless gesture. Since this derivative action is the only effective method of litigating the plaintiffs' claims, the demand requirement of Rule 23.1(2) is excused."

The Tenth Circuit affirmed in deHaas v. Empire Petroleum Company (1970) 435 F.2d 1223, saying:

"Included among the requirements for pleading a derivative action under

---

4. Of course, the Court is without jurisdiction to impress a trust in favor of Ada Rock, but her interests must be taken into account in determining the rights of the stockholders who are before the Court.

5. The price to Irwin and Lease is $4,664.-75, plus interest, and to McCaleb and Crowley, $3,496.00, plus interest.

Rule 23.1 is the necessity of setting forth the efforts of the plaintiff, or the reasons for making no effort, to obtain intracorporate relief for the action he desires. In the case at bar, plaintiff admittedly made no effort to approach the directors but did set forth reasons for not so doing. The allegations may, of course, become the subject of factual dispute (as here) but the issue remains one for the court and its determination lies within the sound discretion of the court. Courts have generally been lenient in excusing demand. See Meltzer v. Atlantic Research Corp., 4 Cir., 330 F.2d 946.

"The trial court here held, prior to trial, that a derivative action was the only effective method of litigating plaintiff's claims and that demand was excused. We are in complete accord with this ruling for the reasons set forth in the trial court's memorandum decision, 286 F.Supp. 809, 813–815, and we find nothing in the trial record that would indicate an abuse of discretion."

Demand is here excused, but we are not out of the woods in our consideration of the derivative claims. Those claims, of course, are claims brought in behalf of a Colorado corporation against a Colorado citizen, and we must think about our jurisdiction to rule on the claims. That we do have jurisdiction to determine the derivative action against Vroom for the recovery of the $15,000.00 paid to him is settled by Smith v. Sperling (1957) 354 U.S. 91, 77 S.Ct. 1112, 1 L. Ed.2d 1205. There, under somewhat similar circumstances the trial court dismissed for want of diversity jurisdiction, and the Supreme Court reversed. It was said:

"The gist of the findings of the District Court is that since there was no fraud on the part of the directors in making the contracts but only an exercise of independent business judgment, the management was not antagonistic to the financial interests of the corporation. That is an issue that goes to the merits, not to the question of juris-

diction. There will, of course, be antagonism between the stockholder and the management where the dominant officers and directors are guilty of fraud or misdeeds. But wrongdoing in that sense is not the sole measure of antagonism. There is antagonism whenever the management is aligned against the stockholder and defends a course of conduct which he attacks. The charge normally is cast in terms of fraud, breach of trust, or illegality. . . .

"As the court said in Delaware & Hudson Co. v. Albany & S. R. Co., 213 U.S. 435, 451, [29 S.Ct. 540, 545, 53 L.Ed. 862,] where the management was deemed to be antagonistic to the stockholder 'the attitude of the directors need not be sinister. It may be sincere.' Whenever the management refuses to take action to undo a business transaction or whenever, as in this case, it so solidly approves it that any demand to rescind would be futile, antagonism is evident. The cause of action, to be sure is that of the corporation. But the corporation has become through its managers hostile and antagonistic to the enforcement of the claim. . . .

"Here it is plain that the stockholder and those who manage the corporation are completely and irrevocably opposed on a matter of corporate practice and policy. A trial may demonstrate that the stockholder is wrong and the management right. It may show a dispute that lies in the penumbra of business judgment, unaffected by fraud. But that issue goes to the merits, not to jurisdiction. There is jurisdiction if there is real collision between the stockholder and his corporation. That there is such a collision is evident here."

It is settled that where the interests of the citizen corporation are consistent with those of the non-citizen plaintiffs and inconsistent with those of the citizen defendant, the parties are realigned to accomplish diversity jurisdiction. The corporation is here re-

aligned as a defendant to permit jurisdiction. See, annotation in 68 A.L.R.2d 821, 833, following the report of the decisions in Smith v. Sperling, supra, and Swanson v. Traer (1957) 354 U.S. 114, 77 S. Ct. 1116, 1 L.Ed.2d 1221, and see Judge Doyle's opinion in Dowd v. Front Range Mines, Inc. (D.C.1965) 242 F.Supp. 591. We have jurisdiction to pass upon the self-awarded salary paid to Vroom, and we do so.

It is hornbook law that a director of a corporation stands in a fiduciary relationship with the stockholders,[6] and in light of the inequality of the position of the parties here, Vroom's duties were even greater than those of the usual corporate director, and fraud would be presumed even if the fiduciary status of a person acting as a corporation director were not present. Dittbrenner v. Myerson (1946) 114 Colo. 448, 167 P.2d 15, settled the Colorado law in circumstances of inequality such as we have here. Justice Stone said:

"In such a situation the facts are amply sufficient to bring the case under the third class of fraud set out by Lord Hardwicke in the classic case of Earl of Chesterfield v. Janssen, 2 Ves.Sr. 125, 155: Fraud ' * * * which may be presumed from the circumstances and condition of the parties contracting: * * * to prevent taking surreptitious advantage of the weakness or necessity of another * * *.' The essential condition precedent to the applicability of this doctrine is an 'inequality' between the parties; there must be weakness on the one side and advantage taken of that weakness on the other, and 'It must appear that the dominant party either brought about the unevenness in the conditions, or, finding it ready to his hand, utilized and traded on it to extract from the servient party a gift

or contract which he would not otherwise have made.' Bower on Actionable Non-Disclosure, p. 390, § 428. Where such a relation subsists between two persons, 'The law presumes in favour of the servient party against the dominant party, (1) that the relation placed the dominant party in a position to exercise influence and dominion over the servient party; (2) that such influence and dominion operated upon, and procured the transaction; and (3), that the influence was an improper and unfair, or (to use the accepted phrase) an "undue influence".' Bower on Actionable Non-Disclosure, p. 363, § 405. ' * * * when the relative position of the parties is such as prima facie to raise this presumption, the transaction cannot stand unless the person claiming the benefit of it is able to repel the presumption by contrary evidence, proving it to have been in point of fact fair, just, and reasonable.' Aylesford v. Morris, 8 Ch.App. 484, quoted in Bower on Actionable Non-Disclosure, p. 391 § 428.

" 'The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation is shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed.' Sears v. Hicklin, 13 Colo. 143, 148, 21 P. 1022, 1023, quoting from Kerr, Fraud & Mistake 183."

Vroom with the connivance of his personal secretary, voted himself a $15,000.00 retroactive salary to be paid from a loan to the corporation. (He was actually paid $15,048.75) This salary was voted as payment for operating a losing business, and where the money is coming

---

6. United States v. Gates (1967 10 Cir.) 376 F.2d 65; Wilshire Oil Co. of Tex. v. Riffe (1967 10 Cir.) 381 F.2d 646; Herald Co. v. Bonfils (1970 D.C.Colo.) 315 F.Supp. 497; Hudson v. American Found-ers Life Ins. Co. (1963) 151 Colo. 54, 377 P.2d 391; Kullgren v. Navy Gas & Supply Co. (1943) 110 Colo. 454, 135 P.2d 1007.

from to pay the bank loan when in a few years the balloon payment provisions of the loan agreement come into play is completely unclear. The June 4, 1969, resolution authorizing construction of the tennis courts itself said that if the company elected to operate the tennis courts, Vroom would be repaid his initial construction loan from the income derived from the tennis courts, and the resolution authorizing the borrowing from the Bank of Aspen said that the loan's purpose was to repay Vroom, and that "any funds remaining after Roy Vroom is paid in full will be used to improve the tennis club site further." The resolution itself—without reference to its legality or illegality—didn't authorize the expenditure of the borrowed funds to pay Vroom a salary. "Although not necessary to the decision in this case, we comment that unless Vroom can escape under the provisions of Article VII of the Articles of Incorporation it is doubtful that a quorum of directors voted the salary—at least only Vroom and his secretary signed the minutes—and under general principles of Colorado corporation law, Vroom wasn't eligible to vote." Paxton v. Heron (1907) 41 Colo. 147, 92 P. 15; Steele v. Gold Fissure Gold Mining Co. (1908) 42 Colo. 529, 95 P. 349; Laybourn v. Wrape (1922) 72 Colo. 339, 211 P. 367. Moreover, when the salary was to be paid retroactively from borrowed funds for services allegedly rendered to a corporation which was losing money, it is apparent that no thought was given to the corporation's ability to pay as the law demands. Glenmore Distilleries Co. v. Seideman (1967 D.C.N.Y.) 267 F.Supp. 915.

■ Vroom says that Article VIII of the Articles of Incorporation provide him with an escape hatch from the inevitable cancellation of his otherwise unlawful salary. It does not. It applies, by its terms, to contracts between the corporation and other corporations having common directors and it says:

"Each person who may become a director or officer of the corporation is hereby relieved from any liability that might otherwise arise by reason of his contracting with the corporation for the benefit of himself or any firm or corporation in which he may in any way be interested."

■ Read in context, Article VIII was not intended to and it does not apply to salaries voted for himself by a dominant director. And, even if it did, the record establishes that the salary was completely unreasonable under all of the circumstances. Glenmore Distilleries Co. v. Seideman, *supra*. Exculpatory provisions of corporate articles create no license to steal. They do no more than to validate otherwise invalid agreements if such agreements are shown to be fair. Vroom was not entitled to the salary he voted himself, and he owes it back to West End Development Company plus interest from the date of its unlawful payment to him. No more is Vroom entitled to charge the corporation interest in the amount of $3,128.24 on the loan he made to the corporation which interest he paid to himself when the $39,216.91 loan principal was repaid him from the Bank of Aspen loan. The corporation is entitled to judgment for that amount, again plus interest.

■ We have not resolved the questions of the corporation's claims for (a) a full accounting from Vroom, and (b) damages which may result from the allegedly improvident investment in tennis courts.[7] We shall not resolve those questions in this lawsuit. It is doubtful that they are included in the issues framed, but, even if they are we doubt our jurisdiction to determine these matters, and the damage question does not appear to be ripe for present decision.

In passing upon the damage claim it would be necessary to determine if the

---

7. Plaintiffs urge that the building of the tennis courts was ultra vires. We disagree. We think that construction and operation of commercial tennis courts lies within the powers and purposes enumerated in Article III, paragraph 1, of the corporation's articles.

tennis courts represent the highest and best use of the land. We would be required to determine the fair cash market value of the raw land involved applied to its highest and best use, add to that value the cost of the tennis courts, and see if the value of the developed land equaled the sum of those two amounts. Then, it would be necessary to take into account the fact that the tennis courts are built on land included in a zoning setback area and defendant Vroom's belief that the developed tennis courts add value to the remainder of the undeveloped land. This is a neat appraisal problem which requires a use study and an appraisal of all of the land owned by the corporation if all of the land be so developed. It is likely that such a study would use at least in part an income approach to value, and this would directly or indirectly take into account the loss history of the tennis courts. The record is not adequate to make any findings in this area, and we leave this for later determination after an appropriate record can be made.

However, this determination will not be made by this Court even upon a later full record. After the decree in this case is implemented [and assuming that a similar result is reached in Ada Rock's case now pending in the state court] the stock of West End Development Company will be owned:

| | |
|---|---|
| Vroom | 33.3353 |
| Irwin | 14.8085 |
| Lease | 14.8085 |
| Rock | 14.8085 |
| McCaleb | 11.1091 |
| Crowley | 11.1091 |

This will give plaintiffs and Ada Rock control of 66.64% of the stock. Even without the stock to be awarded to Rock if the state court disagrees with our findings, plaintiffs, and Rock, taking into account Rock's present stock ownership, will control 62.08% of the corporation's stock. Under these circumstances, the antagonism permitting realignment for diversity purposes would not exist under the rule of Smith v. Sperling, and Swanson v. Traer, supra. By the same token, with the implementation of this decree and plaintiffs' resultant control of the corporation, all of its books and records will be under their direction, and the Court's assistance in forcing an examination of those books and records should not be required. If, after an examination of the corporate books, an accounting appears to be necessary, the jurisdictional antagonism between plaintiffs and the corporation would not exist, and any such proceeding would be for the state courts to handle.

Lastly, plaintiffs ask for an award of attorneys fees for counsels' services in prosecuting the derivative claim. Counsel fees may be and usually are awarded when the attorneys' services result in a pecuniary benefit to the corporation. Trustees v. Greenough (1882) 105 U.S. 527, 26 L.Ed. 1157; McCourt v. Singers-Bigger (1900 8 Cir.) 145 F. 103 [which was a case tried in Colorado]; Slayton v. Missouri Pacific Railroad Company (1968 D.C.Mo.) 279 F.Supp. 525; Mardel Securities, Inc. v. Alexandria Gazette Corporation (1967 D.C.Va.) 278 F.Supp. 1010; and see annotation in 39 A.L.R.2d 580. Attorneys fees should be and they are awarded in this case in the amount of $5,000.00, such fees to be paid by the corporation to counsel for plaintiffs. Of course, the corporation should pay none of defendants' attorneys fees, but if it has done so, this payment should be accounted for in the accounting suit which may follow.